MacDonald, D. Lloyd, J.
The District Attorney (the “Commonwealth”) moved for a day to life civil commitment of the Defendant/Respondent Paul Cloutier (the “Defendant” or “Cloutier”) as a sexually dangerous person (“SDP”) pursuant to G.L.c. 123A, §12.
Over a three-day period the case was tried to the Court, with the Defendant having waived his right to ajuxy. G.L.c. 123A, §14(a).
Thirty-eight exhibits were entered, including the curricula vitae of the five experts who testified. The exhibits included a complete copy of the Defendant’s criminal record, police reports of the predicate sex offenses, the Defendant’s disciplinary history while incarcerated and probation and parole supervision reports.
Five highly credentialed specialists in the field of sexual deviancy and dangerousness and the application of G.L.c. 123A to the offender population testified. Two such experts did so in support of the Commonwealth’s petition (Michael Henry, Psy.D. and JohnDaignault, Psy.D.) and three on behalf of Cloutier (Michael Murphy, Ed.D., Leonard Bard, Ph.D. and Joseph Plaud, Ph.D.) (hereinafter, all will be individually referred to as “Doctor” along with their surnames). Drs. Henry and Murphy had been appointed as Qualified Examiners pursuant to G.L.c. 123A, §§1 and 13. The detailed written reports from each of the testifying experts were entered as exhibits.
In addition to the five testifying experts, the Court heard the testimony of Donna Barton, the Defendant’s girlfriend with whom he lived from 2002-2005 and with whom he has continued to maintain a relationship notwithstanding his incarceration in November 2005. The latter incarceration preceded the institution of these proceedings.
Until the Court’s decision was orally rendered at the end of the trial, Cloutier was confined on a temporary basis at the Treatment Center pursuant to G.L.c. 123A, § 12(e).
I reviewed all of the exhibits and have drawn what I believe to be reasonable inferences from them and considered the same in light of the arguments by counsel. I have concluded that the Commonwealth has failed to prove beyond a reasonable doubt that Cloutier has a mental abnormality or personality disorder as those terms are defined in the statute. I further find that the Commonwealth failed to prove beyond a reasonable doubt that the defendant would be likely to commit sex offenses if not confined to a secure facility. Accordingly, the Commonwealth’s petition is dismissed, and judgment shall enter for Cloutier.
Requisite Criteria
There are three elements that the Commonwealth must prove beyond a reasonable doubt in a Section 12 proceeding:
1. That the respondent has been convicted of a “sexual offense,” as that term is defined in c. 123A;
2. That he suffers from a mental abnormality or personality disorder, and
3. That the mental abnormality or personality disorder makes him likely to engage in further sexual offenses if not confined to a secure facility.
G.L.c. 123A, §1.
In addition to the statutory framework, there is a federal constitutional overlay, Kansas v. Crane, 534 U.S. 407, 412-13 (2002). The Commonwealth must prove beyond a reasonable doubt that the respondent has “serious difficulty in controlling [his] behavior.” Id. This requirement is intended to distinguish “the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.” Id.
“Mental abnormality” and “personality disorder” are terms of art under the SDP statute. Mental abnormality is a “congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons.” G.L.c. 123A, §1. Personality disorder is defined as a “congenital or acquired physical or mental condition that results in a general lack of power to control sexual impulses.” Id.
Mental abnormality and personality disorder so defined do not have to fit any of the clinical categories of the Diagnostic and Statistical Manual of Mental Disorders IV-TR (“DSM IV”). “While [the statutory] condition may often correlate with one or more clini *9 cally defined mental illnesses, the statute does not require express proof of a clinically defined mental illness, nor does the Constitution require that it do so." Dutil, Petitioner, 437 Mass. 9, 15 (2002), citing Kansas v. Hendricks, 521 U.S. 346, 359 (1997).
The third element to be proved is that on account of the mental abnormality or personality disorder, the petitioner is “likely to engage in further sexual offenses if not confined to a secure facility." G.L.c. 123A, §1. “Likely” for purposes of determining whether a respondent is an SDP has been defined by the SJC as meaning that “it is reasonably to be expected in the context of the particular facts and circumstances at hand.” Commonwealth v. Boucher, 438 Mass. 274, 276-77 (2002).
“Likely” is not a quantifiable statistical probability but must be more than a mere propensity or possibility. Id. Rather, the fact finder (juiy or judge) must determine whether the risk reaches or fails to reach the level of being “likely” by evaluating (a) the seriousness of the threatened harm, (b) the relative certainty of the anticipated harm, and (c) the possibility of successful intervention to prevent that harm. Id. In bottom line terms, on this dimension of the SDP determination the Commonwealth must prove beyond a reasonable doubt that the Defendant “would reasonably be expected to engage in sexual offenses if not confined to a secure facility.” Id. at 281.
Application of the Law to the Facts
Cloutier was born in 1963. He is currently 43 years old. The sex offenses underlying the Commonwealth’s petition were both for rape and occurred within a six-month period in 1982 when the defendant was 19.
The Defendant has an aggravated criminal record that began with breaking and entering charges in the Juvenile Court when he was 14 and continued unabated through 1992 when he was sentenced to concurrent 12-15 year terms for armed robbery and armed robbery while masked. In addition to the two rape convictions and two 1992 robberies, Cloutier’s adult record also includes convictions for escape, breaking and entering, further armed robberies and various drug and alcohol offenses.
The Defendant’s disciplinary record while incarcerated was also aggravated, with a number of violent assaults having been committed.
The Defendant was released on his 1992 armed robbery convictions in 2002. He thereafter resided in Methuen with his girlfriend, Donna Barton, for three years without incident. During most of that time he was gainfully employed. It appears that Cloutier’s employment was terminated upon his employer having become aware of the defendant’s registration as a Level 3 sex offender pursuant to G.L.c. 6, §178K(1).
In November 2005 the Defendant was arrested for a Class B drug possession offense, for which he was sentenced to a 9-month term in the Essex House of Correction. It was as the defendant was wrapping up the Essex sentence that the District Attorney here moved for his commitment as a sexually dangerous person.
There was unanimity among the testifying experts that the defendant exhibited an anti-social personality disorder as defined by the DSM-IV, the authoritative diagnostic manual of the psychiatric profession. The Court accepts that diagnosis as accurate. However, under G.L.c. 123A such a mental condition is insufficient by itself to meet the second element of sexual dangerousness, i.e., the mental/physical state element.
Specifically (as noted above), the statutorily defined “mental abnormality” must be one “that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons” (emphasis added). And the statutorily defined “personality disorder” is a “congenital or acquired physical or mental condition that results in a general lack of power to control sexual impulses" (emphasis added). Common to both definitions is the nexus between a mental or physical state or condition and the inability to control one’s specifically sexual conduct.
The only evidence of sexually deviant conduct during Cloutier’s entire life — whether while Cloutier was at liberty or during the many years of his various incarcerations — was that of the two 1982 rapes. Dr. Murphy, one of the two Qualified Examiners who assessed the Defendant pursuant to the District Attorney’s petition, concluded that he was not sexually dangerous.
The Court places particular importance on Dr. Murphy’s conclusions for several reasons. First, as a Qualified Examiner he was independent. Second, Dr. Murphy’s 2006 examination of Cloutier was in fact the second time he examined Cloutier in connection with an SDP determination. In 2001 he had done so before the petition was withdrawn because of Cloutier’s ineligibility under the SDP statutory regime in place at the time.
In 2001 Dr. Murphy concluded that Cloutier did meet the mental abnormality/personality disorder element of c. 123A. However, Cloutier’s conduct during the three years following his release in 2002 (most notably, his employment, his stable heterosexual relationship with Donna Barton and the absence of any indicia of sexually deviant acting out) convinced Dr. Murphy that the Defendant was not sexually dangerous as statutorily defined. From the perspective of 2006, Dr. Murphy viewed the index offenses committed 23 years earlier as part of the defendant’s undifferentiated anti-social behavior and not reflective of c. 123A sexual dangerousness.
*10 In a related finding, Dr. Murphy also concluded that Cloutier was unlikely to reoffend sexually.
Dr. Murphy’s conclusions were affirmed and amplified by the conclusions of the two experts (as noted, also highly credentialed) engaged by the defendant, Drs. Bard and Plaud. Common to the three was their characterization of the 1982 rapes as constituent incidents of the defendant’s generalized anti-social conduct committed by a 19-year-old.
There was also testimony as to empirical research (acknowledged by the Commonwealth’s experts as authoritative) that convincingly demonstrates a steady, “linear” decline of sexual reoffending by convicted rapists after the age of 25. Drs. Murphy, Bard and Plaud cited this research in support of their conclusions that there was no basis to find that Clout-ier “would reasonably be expected to engage in sexual offenses if not confined to a secure facility.” Commonwealth v. Boucher, 438 Mass. 274, 281 (2002).
Their conclusions appear to be well founded on a consideration of the totality of the evidence. At a minimum, the three experts’ separate assessments introduce a tangibly reasonable doubt as to “mental/physical state” and “likelihood” elements of the SDP issue before the Court.
In ruling as it has, the Court is not making a determination that the Defendant is unlikely to commit further crimes in the future. Unfortunately, there is nothing in the Defendant’s history that would lead to that conclusion. Cloutier’s anti-social personality disorder appears in place. However, the Supreme Court of the United States in Kansas v. Crane, supra, has ruled that civil commitment is constitutionally inappropriate for a person who is simply a “dangerous but typical recidivist convicted in an ordinary criminal case.” 534 U.S. at 413.
On the record before the Court the defendant is just that: a dangerous but typical recidivist convicted in an ordinary criminal case.[1]
A one day to life civil commitment pursuant to G.L.c. 123A is legal only for a narrowly defined class of offenders where the specific statutory conditions of G.L.c. 123A that focus on a person’s inability to control predatory sexual impulses are present and each is proved beyond a reasonable doubt. There was insufficient proof of such here.
ORDER
For the foregoing reasons, the Commonwealth has not proved beyond a reasonable doubt that Paul Clout-ier is sexually dangerous. The Commonwealth’s petition is DISMISSED and judgment shall enter for the Defendant/Respondent.

In stating itself in these terms, the Court is not accepting as inevitable the Defendant’s future relapse into crime. It is to be hoped that the accumulated lessons of his lifetime will serve at this juncture to convince Cloutier that there is a better course to be followed. And there is reason to be hopeful in this regard. But for his 2005 drug possession offense (and the return to drug abuse that it reflected) the Defendant’s conduct in the 2002-2005 period was a substantial departure from his earlier life. Further, the Court was impressed with the testimony of Donna Barton and the description not only of the normality of their relationship, including its intimacies, but of his conduct in the workplace and as a provider. And the Court notes the testimony of all five experts that even an anti-social personality disorder is subject to the aging process (what was described as “burn out”). Thus, notwithstanding what was quite literally a life of crime for the Defendant prior to 2002, there is objective reason for the public to feel less at risk. And should the defendant recidivate, then the full force of the law for dealing with “the typical recidivist convicted in an ordinary criminal case” can be brought to bear against him.