# KANSAS *v.* CRANE

No. 00–957.   Argued October 30, 2001—Decided January 22, 2002

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, KENNEDY, SOUTER, and GINSBURG, JJ., joined. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined, *post*, p. 415.

*Carla J. Stovall,* Attorney General of Kansas, argued the cause for petitioner. With her on the briefs was *Stephen R. McAllister,* State Solicitor.

*John C. Donham* argued the cause and filed a brief for respondent.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Illinois et al. by *James E. Ryan,* Attorney General of Illinois, *Joel D. Bertocchi,* Solicitor General, and *William L. Browers, Lisa Anne Hoffman,* and *Margaret M. O'Connell,* Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Janet Napolitano* of Arizona, *Bill Lockyer* of California, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Thomas J. Miller* of Iowa, *J. Joseph Curran, Jr.,* of Maryland, *Thomas F. Reilly* of Massachusetts, *Mike Moore* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Don Stenberg* of Nebraska, *John J. Farmer, Jr.,* of New Jersey, *Wayne Stenehjem* of North Dakota, *W. A. Drew Edmondson* of Oklahoma, *D. Michael Fisher* of Pennsylvania, *Charles M. Condon* of South Carolina, *Christine O. Gregoire* of Washington, and *James E. Doyle* of Wisconsin; for the Association for the Treatment of Sexual Abusers by *John J. Sulli-*

JUSTICE BREYER delivered the opinion of the Court.

This case concerns the constitutional requirements substantively limiting the civil commitment of a dangerous sexual offender—a matter that this Court considered in *Kansas* v. *Hendricks*, 521 U. S. 346 (1997). The State of Kansas argues that the Kansas Supreme Court has interpreted our decision in *Hendricks* in an overly restrictive manner. We agree and vacate the Kansas court's judgment.

## I

In *Hendricks*, this Court upheld the Kansas Sexually Violent Predator Act, Kan. Stat. Ann. § 59–29a01 *et seq.* (1994), against constitutional challenge. 521 U. S., at 371. In doing so, the Court characterized the confinement at issue as civil, not criminal, confinement. *Id.*, at 369. And it held that the statutory criterion for confinement embodied in the statute's words "mental abnormality or personality disorder" satisfied "'substantive' due process requirements." *Id.*, at 356, 360.

In reaching its conclusion, the Court's opinion pointed out that "States have in certain narrow circumstances provided for the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and safety." *Id.*, at 357. It said that "[w]e have consistently upheld such involuntary commitment statutes" when (1) "the confinement takes place pursuant to proper procedures and evidentiary standards," (2) there is a finding of "dangerousness either to one's self or to others," and (3) proof of dangerousness is "coupled . . . with the proof of some additional factor, such as a 'mental illness' or 'mental

*van* and *Michael E. Lackey, Jr.;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Richard A. Samp.*

Briefs of *amici curiae* urging affirmance were filed for the American Psychiatric Association et al. by *Richard G. Taranto;* and for the National Association of Criminal Defense Lawyers et al. by *Jody Manier Kris, Lisa Kemler,* and *Steven R. Shapiro.*

abnormality.'" *Id.*, at 357–358. It noted that the Kansas "Act unambiguously requires a finding of dangerousness either to one's self or to others," *id.*, at 357, and then "links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior," *id.*, at 358 (citing Kan. Stat. Ann. § 59–29a02(b) (1994)). And the Court ultimately determined that the statute's "requirement of a 'mental abnormality' or 'personality disorder' is consistent with the requirements of . . . other statutes that we have upheld in that it narrows the class of persons eligible for confinement to those who are unable to control their dangerousness." 521 U. S., at 358.

The Court went on to respond to Hendricks' claim that earlier cases had required a finding, not of "mental abnormality" or "personality disorder," but of "mental illness." *Id.*, at 358–359. In doing so, the Court pointed out that we "have traditionally left to legislators the task of defining [such] terms." *Id.*, at 359. It then held that, to "the extent that the civil commitment statutes we have considered set forth criteria relating to an individual's inability to control his dangerousness, the Kansas Act sets forth comparable criteria." *Id.*, at 360. It added that Hendricks' own condition "doubtless satisfies those criteria," for (1) he suffers from pedophilia, (2) "the psychiatric profession itself classifies" that condition "as a serious mental disorder," and (3) Hendricks conceded that he cannot "'control the urge'" to molest children. And it concluded that this "admitted lack of volitional control, coupled with a prediction of future dangerousness, adequately distinguishes Hendricks from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." *Ibid.*

## II

In the present case the State of Kansas asks us to review the Kansas Supreme Court's application of *Hendricks*. The State here seeks the civil commitment of Michael

Crane, a previously convicted sexual offender who, according to at least one of the State's psychiatric witnesses, suffers from both exhibitionism and antisocial personality disorder. *In re Crane*, 269 Kan. 578, 580–581, 7 P. 3d 285, 287 (2000); cf. also American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 569 (rev. 4th ed. 2000) (DSM–IV) (detailing exhibitionism), 701–706 (detailing antisocial personality disorder). After a jury trial, the Kansas District Court ordered Crane's civil commitment. 269 Kan., at 579–584, 7 P. 3d, at 286–288. But the Kansas Supreme Court reversed. *Id.*, at 586, 7 P. 3d, at 290. In that court's view, the Federal Constitution as interpreted in *Hendricks* insists upon "a finding that the defendant cannot control his dangerous behavior"—even if (as provided by Kansas law) problems of "emotional capacity" and not "volitional capacity" prove the "source of bad behavior" warranting commitment. 269 Kan., at 586, 7 P. 3d, at 290; see also Kan. Stat. Ann. §59–29a02(b) (2000 Cum. Supp.) (defining "[m]ental abnormality" as a condition that affects an individual's emotional *or* volitional capacity). And the trial court had made no such finding.

Kansas now argues that the Kansas Supreme Court wrongly read *Hendricks* as requiring the State *always* to prove that a dangerous individual is *completely* unable to control his behavior. That reading, says Kansas, is far too rigid.

### III

We agree with Kansas insofar as it argues that *Hendricks* set forth no requirement of *total* or *complete* lack of control. *Hendricks* referred to the Kansas Act as requiring a "mental abnormality" or "personality disorder" that makes it *"difficult, if not impossible, for the [dangerous] person to control his dangerous behavior."* 521 U. S., at 358 (emphasis added). The word "difficult" indicates that the lack of control to which this Court referred was not absolute. Indeed, as different *amici* on opposite sides of this case agree, an absolutist approach is unworkable. Brief for Association for the

Treatment of Sexual Abusers as *Amicus Curiae* 3; cf. Brief for American Psychiatric Association et al. as *Amici Curiae* 10; cf. also American Psychiatric Association, Statement on the Insanity Defense 11 (1982), reprinted in G. Melton, J. Petrila, N. Poythress, & C. Slobogin, Psychological Evaluations for the Courts 200 (2d ed. 1997) (" 'The line between an irresistible impulse and an impulse not resisted is probably no sharper than that between twilight and dusk' "). Moreover, most severely ill people—even those commonly termed "psychopaths"—retain some ability to control their behavior. See Morse, Culpability and Control, 142 U. Pa. L. Rev. 1587, 1634–1635 (1994); cf. Winick, Sex Offender Law in the 1990s: A Therapeutic Jurisprudence Analysis, 4 Psychol. Pub. Pol'y & L. 505, 520–525 (1998). Insistence upon absolute lack of control would risk barring the civil commitment of highly dangerous persons suffering severe mental abnormalities.

We do not agree with the State, however, insofar as it seeks to claim that the Constitution permits commitment of the type of dangerous sexual offender considered in *Hendricks* without *any* lack-of-control determination. See Brief for Petitioner 17; Tr. of Oral Arg. 22, 30–31. *Hendricks* underscored the constitutional importance of distinguishing a dangerous sexual offender subject to civil commitment "from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." 521 U. S., at 360. That distinction is necessary lest "civil commitment" become a "mechanism for retribution or general deterrence"—functions properly those of criminal law, not civil commitment. *Id.*, at 372–373 (KENNEDY, J., concurring); cf. also Moran, The Epidemiology of Antisocial Personality Disorder, 34 Social Psychiatry & Psychiatric Epidemiology 231, 234 (1999) (noting that 40%–60% of the male prison population is diagnosable with antisocial personality disorder). The presence of what the "psychiatric profession itself classifie[d] . . . as a serious mental disorder" helped to make that distinction in *Hendricks*. And a critical distinguishing feature of that "serious . . . disorder" there

consisted of a special and serious lack of ability to control behavior.

In recognizing that fact, we did not give to the phrase "lack of control" a particularly narrow or technical meaning. And we recognize that in cases where lack of control is at issue, "inability to control behavior" will not be demonstrable with mathematical precision. It is enough to say that there must be proof of serious difficulty in controlling behavior. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case. 521 U. S., at 357–358; see also *Foucha* v. *Louisiana,* 504 U. S. 71, 82–83 (1992) (rejecting an approach to civil commitment that would permit the indefinite confinement "of any convicted criminal" after completion of a prison term).

We recognize that *Hendricks* as so read provides a less precise constitutional standard than would those more definite rules for which the parties have argued. But the Constitution's safeguards of human liberty in the area of mental illness and the law are not always best enforced through precise bright-line rules. For one thing, the States retain considerable leeway in defining the mental abnormalities and personality disorders that make an individual eligible for commitment. *Hendricks,* 521 U. S., at 359; *id.,* at 374–375 (BREYER, J., dissenting). For another, the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law. See *id.,* at 359. See also, *e. g., Ake* v. *Oklahoma,* 470 U. S. 68, 81 (1985) (psychiatry not "an exact science"); DSM–IV xxx ("concept of mental disorder . . . lacks a consistent operational definition"); *id.,* at xxxii–xxxiii (noting the "imperfect fit between the questions of ultimate concern to the law and

the information contained in [the DSM's] clinical diagnosis"). Consequently, we have sought to provide constitutional guidance in this area by proceeding deliberately and contextually, elaborating generally stated constitutional standards and objectives as specific circumstances require. *Hendricks* embodied that approach.

## IV

The State also questions how often a volitional problem lies at the heart of a dangerous sexual offender's serious mental abnormality or disorder. It points out that the Kansas Supreme Court characterized its state statute as permitting commitment of dangerous sexual offenders who (1) suffered from a mental abnormality properly characterized by an "emotional" impairment and (2) suffered no "volitional" impairment. 269 Kan., at 583, 7 P. 3d, at 289. It adds that, in the Kansas court's view, *Hendricks* absolutely forbids the commitment of any such person. 269 Kan., at 585–586, 7 P. 3d, at 290. And the State argues that it was wrong to read *Hendricks* in this way. Brief for Petitioner 11; Tr. of Oral Arg. 5.

We agree that *Hendricks* limited its discussion to volitional disabilities. And that fact is not surprising. The case involved an individual suffering from pedophilia—a mental abnormality that critically involves what a lay person might describe as a lack of control. DSM–IV 571–572 (listing as a diagnostic criterion for pedophilia that an individual have acted on, or been affected by, "sexual urges" toward children). Hendricks himself stated that he could not "'control the urge'" to molest children. 521 U. S., at 360. In addition, our cases suggest that civil commitment of dangerous sexual offenders will normally involve individuals who find it particularly difficult to control their behavior—in the general sense described above. Cf. *Seling* v. *Young*, 531 U. S. 250, 256 (2001); cf. also Abel & Rouleau, Male Sex Offenders, in Handbook of Outpatient Treatment of Adults: Nonpsychotic Mental Disorders 271 (M. Thase,

B. Edelstein, & M. Hersen eds. 1990) (sex offenders' "compulsive, repetitive, driven behavior . . . appears to fit the criteria of an emotional or psychiatric illness"). And it is often appropriate to say of such individuals, in ordinary English, that they are "unable to control their dangerousness." *Hendricks, supra,* at 358.

Regardless, *Hendricks* must be read in context. The Court did not draw a clear distinction between the purely "emotional" sexually related mental abnormality and the "volitional." Here, as in other areas of psychiatry, there may be "considerable overlap between a . . . defective understanding or appreciation and . . . [an] ability to control . . . behavior." American Psychiatric Association Statement on the Insanity Defense, 140 Am. J. Psychiatry 681, 685 (1983) (discussing "psychotic" individuals). Nor, when considering civil commitment, have we ordinarily distinguished for constitutional purposes among volitional, emotional, and cognitive impairments. See, *e. g., Jones* v. *United States,* 463 U. S. 354 (1983); *Addington* v. *Texas,* 441 U. S. 418 (1979). The Court in *Hendricks* had no occasion to consider whether confinement based solely on "emotional" abnormality would be constitutional, and we likewise have no occasion to do so in the present case.

\* \* \*

For these reasons, the judgment of the Kansas Supreme Court is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

Today the Court holds that the Kansas Sexually Violent Predator Act (SVPA) cannot, consistent with so-called substantive due process, be applied as written. It does so even though, less than five years ago, we upheld the very same

statute against the very same contention in an appeal by the very same petitioner (the State of Kansas) from the judgment of the very same court. Not only is the new law that the Court announces today wrong, but the Court's manner of promulgating it—snatching back from the State of Kansas a victory so recently awarded—cheapens the currency of our judgments. I would reverse, rather than vacate, the judgment of the Kansas Supreme Court.

## I

Respondent was convicted of lewd and lascivious behavior and pleaded guilty to aggravated sexual battery for two incidents that took place on the same day in 1993. In the first, respondent exposed himself to a tanning salon attendant. In the second, 30 minutes later, respondent entered a video store, waited until he was the only customer present, and then exposed himself to the clerk. Not stopping there, he grabbed the clerk by the neck, demanded she perform oral sex on him, and threatened to rape her, before running out of the store. Following respondent's plea to aggravated sexual battery, the State filed a petition in State District Court to have respondent evaluated and adjudicated a sexual predator under the SVPA. That Act permits the civil detention of a person convicted of any of several enumerated sexual offenses, if it is proven beyond a reasonable doubt that he suffers from a "mental abnormality"—a disorder affecting his "emotional or volitional capacity which predisposes the person to commit sexually violent offenses"—or a "personality disorder," either of "which makes the person likely to engage in repeat acts of sexual violence." Kan. Stat. Ann. §§ 59–29a02(a), (b) (2000 Cum. Supp.).

Several psychologists examined respondent and determined he suffers from exhibitionism and antisocial personality disorder. Though exhibitionism alone would not support classification as a sexual predator, a psychologist concluded that the two in combination did place respondent's condition

within the range of disorders covered by the SVPA, "cit[ing] the increasing frequency of incidents involving [respondent], increasing intensity of the incidents, [respondent's] increasing disregard for the rights of others, and his increasing daring and aggressiveness." *In re Crane*, 269 Kan. 578, 579, 7 P. 3d 285, 287 (2000). Another psychologist testified that respondent's behavior was marked by "impulsivity or failure to plan ahead," indicating his unlawfulness "was a combination of willful and uncontrollable behavior," *id.*, at 584–585, 7 P. 3d, at 290. The State's experts agreed, however, that " '[r]espondent's mental disorder does not impair his volitional control to the degree he cannot control his dangerous behavior.' " *Id.*, at 581, 7 P. 3d, at 288.

Respondent moved for summary judgment, arguing that for his detention to comport with substantive due process the State was required to prove not merely what the statute requires—that by reason of his mental disorder he is "likely to engage in repeat acts of sexual violence"—but also that he is unable to control his violent behavior. The trial court denied this motion, and instructed the jury pursuant to the terms of the statute. *Id.*, at 581, 7 P. 3d, at 287–288. The jury found, beyond a reasonable doubt, that respondent was a sexual predator as defined by the SVPA. The Kansas Supreme Court reversed, holding the SVPA unconstitutional as applied to someone, like respondent, who has only an emotional or personality disorder within the meaning of the Act, rather than a volitional impairment. For such a person, it held, the State must show not merely a likelihood that the defendant would engage in repeat acts of sexual violence, but also an inability to control violent behavior. It based this holding solely on our decision in *Kansas* v. *Hendricks*, 521 U. S. 346 (1997).

## II

*Hendricks* also involved the SVPA, and, as in this case, the Kansas Supreme Court had found that the SVPA swept too broadly. On the basis of considerable evidence show-

ing that Hendricks suffered from pedophilia, the jury had found, beyond a reasonable doubt, that Hendricks met the statutory standard for commitment. See *id.*, at 355; *In re Hendricks*, 259 Kan. 246, 247, 912 P. 2d 129, 130 (1996). This standard (to repeat) was that he suffered from a "mental abnormality"—a disorder affecting his "emotional or volitional capacity which predisposes [him] to commit sexually violent offenses"—or a "personality disorder," either of which "makes [him] likely to engage in repeat acts of sexual violence." Kan. Stat. Ann. §§ 59–29a02(a), (b) (2000 Cum. Supp.). The trial court, after determining as a matter of state law that pedophilia was a "mental abnormality" within the meaning of the Act, ordered Hendricks committed. See 521 U. S., at 355–356. The Kansas Supreme Court held the jury finding to be constitutionally inadequate. "Absent . . . a finding [of mental illness]," it said, "the Act does not satisfy . . . constitutional standard[s]," 259 Kan., at 261, 912 P. 2d, at 138. (Mental illness, as it had been defined by Kansas law, required a showing that the detainee "[i]s suffering from a severe mental disorder"; "lacks capacity to make an informed decision concerning treatment"; and "is likely to cause harm to self or others." Kan. Stat. Ann. § 59–2902(h) (1994).) We granted the State of Kansas's petition for certiorari.

The first words of our opinion dealing with the merits of the case were as follows: "Kansas argues that the Act's definition of 'mental abnormality' satisfies 'substantive' due process requirements. We agree." *Hendricks*, 521 U. S., at 356. And the *reason* it found substantive due process satisfied was clearly stated:

> "The Kansas Act is plainly of a kind with these other civil commitment statutes [that we have approved]: It requires a finding of future dangerousness [viz., that the person committed is "likely to engage in repeat acts of sexual violence"], and then links that finding to the existence of a 'mental abnormality' or 'person-

ality disorder' *that makes it difficult, if not impossible, for the person to control his dangerous behavior.* Kan. Stat. Ann. § 59–29a02(b) (1994)." *Id.,* at 358 (emphasis added).

It is the italicized language in the foregoing excerpt that today's majority relies upon as establishing the requirement of a separate *finding* of inability to control behavior. *Ante,* at 411–412.

That is simply not a permissible reading of the passage, for several reasons. First, because the authority cited for the statement—in the immediately following reference to the Kansas Statutes Annotated—is the section of the SVPA that defines "mental abnormality," *which contains no requirement of inability to control.*\* What the opinion was obviously saying was that the SVPA's required finding of a *causal connection* between the likelihood of repeat acts of sexual violence and the existence of a "mental abnormality" or "personality disorder" *necessarily* establishes "difficulty if not impossibility" in controlling behavior. This is clearly confirmed by the very next sentence of the opinion, which reads as follows:

> "The precommitment requirement of a 'mental abnormality' or 'personality disorder' is consistent with the requirements of . . . other statutes that we have upheld in that it narrows the class of persons eligible for confinement to those who are unable to control their dangerousness." 521 U. S., at 358.

It could not be clearer that, in the Court's estimation, the very existence of a mental abnormality or personality dis-

---

\*As quoted earlier in the *Hendricks* opinion, see 521 U. S., at 352, § 59–29a02(b) defines "mental abnormality" as a "congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others."

order *that causes* a likelihood of repeat sexual violence in itself *establishes* the requisite "difficulty if not impossibility" of control. Moreover, the passage in question cannot possibly be read as today's majority would read it because nowhere did the jury verdict of commitment that we reinstated in *Hendricks* contain a separate finding of "difficulty, if not impossibility, to control behavior." That finding must (as I have said) have been embraced within the finding of mental abnormality *causing* future dangerousness. And finally, the notion that the Constitution requires in every case a finding of "difficulty if not impossibility" of control does not fit comfortably with the broader holding of *Hendricks*, which was that "we have never required state legislatures to adopt any particular nomenclature in drafting civil commitment statutes. Rather, we have traditionally left to legislators the task of defining terms of a medical nature that have legal significance." *Id.*, at 359.

The Court relies upon the fact that *"Hendricks* underscored the constitutional importance of distinguishing a dangerous sexual offender subject to civil commitment 'from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings.'" *Ante*, at 412 (quoting 521 U. S., at 360). But the SVPA as written—without benefit of a supplemental control finding—already achieves that objective. It conditions civil commitment not upon a mere finding that the sex offender is likely to reoffend, but only upon the additional finding (beyond a reasonable doubt) that the *cause* of the likelihood of recidivism is a "mental abnormality or personality disorder." Kan. Stat. Ann. §59–29a02(a) (2000 Cum. Supp.). Ordinary recidivists *choose* to reoffend and are therefore amenable to deterrence through the criminal law; those subject to civil commitment under the SVPA, because their mental illness is an affliction and not a choice, are unlikely to be deterred. We specifically pointed this out in *Hendricks*. "Those persons committed under the Act," we said,

"are, by definition, suffering from a 'mental abnormality' or a 'personality disorder' that prevents them from exercising adequate control over their behavior. Such persons are therefore unlikely to be deterred by the threat of confinement." 521 U. S., at 362–363.

## III

Not content with holding that the SVPA cannot be applied as written because it does not require a separate "lack-of-control determination," *ante*, at 412, the Court also reopens a question closed by *Hendricks:* whether the SVPA also cannot be applied as written because it allows for the commitment of people who have mental illnesses other than volitional impairments. *"Hendricks,"* the Court says, "had no occasion to consider" this question. *Ante*, at 415.

But how could the Court possibly have avoided it? The jury whose commitment we affirmed in *Hendricks* had not been asked to find a volitional impairment, but had been charged in the language of the statute, which quite clearly covers nonvolitional impairments. And the fact that it did so had not escaped our attention. To the contrary, our *Hendricks* opinion explicitly and repeatedly recognized that the SVPA reaches individuals with personality disorders, 521 U. S., at 352, 353, 357, 358, and quoted the Act's definition of mental abnormality (§ 59–29a02(b)), which makes plain that it embraces both emotional and volitional impairments, *id.*, at 352. It is true that we repeatedly referred to Hendricks's "volitional" problems—because that was evidently the sort of mental abnormality that he had. But we nowhere accorded any legal significance to that fact—as we could not have done, since it was not a fact that the jury had been asked to determine. We held, without any qualification, "that the Kansas Sexually Violent Predator Act comports with [substantive] due process requirements," *id.*, at 371, because its "precommitment requirement of a 'mental abnormality' or 'personality disorder' is consistent with the requirements of . . . other statutes that we have upheld in

that it narrows the class of persons eligible for confinement to those who are unable to control their dangerousness," *id.*, at 358.

The Court appears to argue that, because *Hendricks* involved a defendant who indeed *had* a volitional impairment (even though we made nothing of that fact), its narrowest holding covers only *that* application of the SVPA, and our statement that the SVPA in its entirety was constitutional can be ignored. See *ante*, at 414–415. This cannot be correct. The narrowest holding of *Hendricks* affirmed the constitutionality of commitment on the basis of the jury charge given in that case (to wit, the language of the SVPA); and since that charge did not require a finding of volitional impairment, neither does the Constitution.

I cannot resist observing that the distinctive status of volitional impairment which the Court mangles *Hendricks* to preserve would not even be worth preserving by more legitimate means. There is good reason why, as the Court accurately says, "when considering civil commitment . . . we [have not] ordinarily distinguished for constitutional purposes among volitional, emotional, and cognitive impairments," *ante*, at 415. We have not done so because it makes no sense. It is obvious that a person may be able to exercise volition and yet be unfit to turn loose upon society. The man who has a will of steel, but who delusionally believes that every woman he meets is inviting crude sexual advances, is surely a dangerous sexual predator.

## IV

I not only disagree with the Court's gutting of our holding in *Hendricks;* I also doubt the desirability, and indeed even the coherence, of the new constitutional test which (on the basis of no analysis except a misreading of *Hendricks*) it substitutes. Under our holding in *Hendricks*, a jury in an SVPA commitment case would be required to find, beyond a reasonable doubt, (1) that the person previously

convicted of one of the enumerated sexual offenses is suffer-
ing from a mental abnormality or personality disorder, and
(2) that this condition renders him likely to commit future
acts of sexual violence.  Both of these findings are coherent,
and (with the assistance of expert testimony) well within the
capacity of a normal jury.  Today's opinion says that the
Constitution requires the addition of a third finding: (3) that
the subject suffers from an inability to control behavior—
not utter inability, *ante*, at 411, and not even inability in a
particular constant degree, but rather inability in a degree
that will vary "in light of such features of the case as the
nature of the psychiatric diagnosis, and the severity of the
mental abnormality itself," *ante*, at 413.

This formulation of the new requirement certainly dis-
plays an elegant subtlety of mind.  Unfortunately, it gives
trial courts, in future cases under the many commitment
statutes similar to Kansas's SVPA, *not a clue* as to how they
are supposed to charge the jury!  Indeed, it does not even
provide a clue to the trial court, on remand, *in this very case*.
What is the judge to ask the jury to find?  It is fine and
good to talk about the desirability of our "proceeding de-
liberately and contextually, elaborating generally stated con-
stitutional standards and objectives as specific circumstances
require," *ante*, at 414, but one would think that this plan
would at least produce the "elaboration" of what the jury
charge should be in the "specific circumstances" of the pres-
ent case.  "[P]roceeding deliberately" is not synonymous
with not proceeding at all.

I suspect that the reason the Court avoids any elaboration
is that elaboration which passes the laugh test is impossible.
How *is* one to frame for a jury the degree of "inability to
control" which, in the particular case, "the nature of the
psychiatric diagnosis, and the severity of the mental ab-
normality" require?  Will it be a percentage ("Ladies and
gentlemen of the jury, you may commit Mr. Crane under the
SVPA only if you find, beyond a reasonable doubt, that he

is 42% unable to control his penchant for sexual violence")? Or a frequency ratio ("Ladies and gentlemen of the jury, you may commit Mr. Crane under the SVPA only if you find, beyond a reasonable doubt, that he is unable to control his penchant for sexual violence 3 times out of 10")? Or merely an adverb ("Ladies and gentlemen of the jury, you may commit Mr. Crane under the SVPA only if you find, beyond a reasonable doubt, that he is appreciably—or moderately, or substantially, or almost totally—unable to control his penchant for sexual violence")? None of these seems to me satisfactory.

But if it is indeed possible to "elaborate" upon the Court's novel test, surely the Court has an obligation to do so in the "specific circumstances" of the present case, so that the trial court will know what is expected of it on remand. It is irresponsible to leave the law in such a state of utter indeterminacy.

\* \* \*

Today's holding would make bad law in any circumstances. In the circumstances under which it is pronounced, however, it both distorts our law and degrades our authority. The State of Kansas, unable to apply its legislature's sexual predator legislation as written because of the Kansas Supreme Court's erroneous view of the Federal Constitution, sought and received certiorari in *Hendricks*, and achieved a reversal, in an opinion holding that "the Kansas Sexually Violent Predator Act comports with [substantive] due process requirements," 521 U. S., at 371. The Kansas Supreme Court still did not like the law and prevented its operation, on substantive due process grounds, once again. The State of Kansas again sought certiorari, asking nothing more than reaffirmation of our 5-year-old opinion—only to be told that what we said then we now unsay. There is an obvious lesson here for state supreme courts that do not agree with our jurisprudence: ignoring it is worth a try.

A jury determined beyond a reasonable doubt that respondent suffers from antisocial personality disorder combined with exhibitionism, and that this is either a mental abnormality or a personality disorder making it likely he will commit repeat acts of sexual violence. That is all the SVPA requires, and all the Constitution demands. Since we have already held precisely that in another case (which, by a remarkable feat of jurisprudential jujitsu the Court relies upon as the only authority for its decision), I would reverse the judgment below.