NOT DESIGNATED FOR PUBLICATION

No. 113,882

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Care
and Treatment of
RICHARD ALLEN HARMON.

MEMORANDUM OPINION

Appeal from Cowley District Court; LADONNA L. LANNING, judge. Opinion filed November 13, 2015. Affirmed.

*Ian T. Otte*, of Herlocker, Roberts & Herlocker, L.L.C., of Winfield, for appellant.

*Christopher E. Smith*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., PIERRON and LEBEN, JJ.

*Per Curiam*: Richard Allen Harmon was convicted of one count of indecent liberties with a child in 1989 and two counts of aggravated indecent liberties with a child in 2005. The victims in these cases were Harmon's daughter and two granddaughters.

In February 2014, the State filed a petition requesting that Harmon be civilly committed as a sexually violent predator according to the standards set forth in K.S.A. 59-29a01 *et seq*. Dr. Angelina Johnson, at Larned State Hospital, evaluated Harmon and determined that he met the sexually-violent-predator criteria. At trial, the only two witnesses were Dr. Johnson for the State and Harmon for the defense. The district court found Dr. Johnson credible and found that the State had proved beyond a reasonable doubt that Harmon was a sexually violent predator.

Harmon argues on appeal that evidence wasn't sufficient to support his civil commitment; Harmon points out that Dr. Johnson made some errors in her evaluation that undermined her credibility. But appellate courts do not make credibility determinations, and even with some errors in her analysis, Dr. Johnson's testimony still provided a sufficient basis for the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Harmon was convicted of one count of indecent liberties with a child in 1989 and two counts of aggravated indecent liberties with a child in 2005. The victims in these cases were Harmon's daughter in 1989 and two granddaughters in 2005. In February 2014, near the end of Harmon's sentence for the 2005 convictions, the State filed a petition requesting that Harmon be civilly committed as a sexually violent predator according to the standards set forth in K.S.A. 59-29a01 *et seq*. The trial court found probable cause to believe Harmon was a sexually violent predator and ordered that Harmon be transferred from prison to a state hospital for evaluation before his trial.

Harmon waived his right to a jury trial, and the State presented testimony from Dr. Johnson at a bench trial in March 2015. Dr. Johnson is the psychologist at Larned State Hospital who evaluated Harmon and determined that he met the sexually-violent-predator criteria; she testified that she had spent 28 hours working on Harmon's case. Over the course of three interviews, Dr. Johnson spent approximately 5 hours interviewing Harmon; the rest of her time was spent reviewing Harmon's records, scoring standardized psychological tests, and writing the report.

Because Harmon challenges the sufficiency of the evidence, we will recount it in some detail. In addition, because the State's evidence rests on the credibility of Dr. Johnson, we will also review her qualifications.

2

At the time she was evaluating Harmon, Dr. Johnson was working under a temporary license and had not yet taken her final licensing exam. She was being supervised by Dr. Greg Shannon, who reviewed and signed off on all of her work on Harmon's case. Dr. Johnson testified that this arrangement was typical for psychologists who were studying for the final licensing exam; these temporarily licensed psychologists must be supervised by a licensed psychologist with more than 5 years of experience. As the State points out in its brief, temporarily licensed psychologists, properly supervised, can evaluate whether a person meets the sexually-violent-predator criteria under K.S.A. 59-29a01 *et seq*. See *In re Care & Treatment of Ritchie*, 50 Kan. App. 2d 698, Syl. ¶ 3, 334 P.3d 890, *rev. denied* 299 Kan. 1269 (2014); K.A.R. 102-1-5a. Harmon did not challenge Dr. Johnson's credentials or supervision at trial, nor does he do so on appeal.

Dr. Johnson testified that she diagnosed Harmon with pedophilia (sexually attracted to females, nonexclusive type); narcissistic personality disorder with antisocial features; exhibitionism; frotteurism (a disorder in which a person gets sexual gratification from touching or rubbing against a nonconsenting person); and voyeurism. Dr. Johnson testified that she diagnosed Harmon with pedophilia (sexually attracted to females, non-exclusive) because he has used children for his own sexual gratification, has never offended against a male victim, and has also had sexual relationships with adult women. This evidence came both from Harmon himself and from his records. Harmon's attraction to female children was demonstrated through his offenses. Regarding his adult relationships, Dr. Johnson testified that Harmon has been married three times (and divorced twice): to a Korean woman in 1974, to a Chinese woman in 1984, and to a woman from the Philippines in 1994, to whom he is still married.

Dr. Johnson stated that her diagnosis of narcissistic personality disorder was based on Harmon's "grandiose sense of self-worth" and sense of entitlement, as demonstrated in Harmon's interviews and in his records. One example Dr. Johnson gave for this diagnosis

related to how Harmon had treated his wives: he said that his Oriental wives became spoiled when they became Americanized and indicated that it was a wife's duty to have sex with her husband even if she didn't want to. Harmon testified to this belief as well: when asked about his marital history, Harmon referred to the Bible to support his belief that it was a wife's duty to have sex with her husband. Dr. Johnson also testified that a hallmark of narcissistic personality disorder is viewing other people as objects for one's personal use and gratification; she said Harmon had described his victims to her as though they were objects or sex toys. Dr. Johnson stated that the antisocial features of her diagnosis were based on Harmon's history of violating other people's rights and showing a lack of empathy, which was apparent when he blamed his victims for his crimes: "He'll say, I feel bad for this; but then he said that it was the granddaughter[s'] fault, because they came to him, they made him take his clothes off to play Naked City." Finally, Dr. Johnson testified that Harmon had discussed in detail his "grandfatherly image," which was an authoritative position that allowed him to coerce and manipulate his victims without admitting that he was doing so—an example of the sense of entitlement and violation of others' rights typical of people with this disorder.

Dr. Johnson diagnosed Harmon with voyeurism, or "peeping behavior," based on Harmon telling her that he had looked at his mother in the shower as a teenager and had watched a child undress in his backyard and used those experiences for his own sexual gratification. She testified that she had diagnosed Harmon with exhibitionism based on both his records and his interview. Harmon denied exhibitionist behaviors during his interviews with Dr. Johnson but did tell her that he had removed his clothes in front of a 6-year-old child. Dr. Johnson also supported this diagnosis with information from Harmon's records that children had caught him in the nude and that he had exposed himself to his daughter's friend and told her she could "do magic" by touching his penis. Finally, Dr. Johnson testified that she had diagnosed Harmon with frotteurism based on statements he had made to her about fondling children at a pajama party and fondling a young girl while playing with her in a swimming pool.

4

Dr. Johnson testified that in her opinion Harmon's mental abnormalities and personality disorder made him likely to engage in repeat acts of sexual violence. She stated that all of Harmon's sexual relationships were based in sexual offending of some kind, from voyeurism (watching his mother in the shower when he was a teenager) through his marriages (in which he felt entitled to sex regardless of what his wives wanted)—not to mention the sexual abuse of his daughter and granddaughters. Dr. Johnson testified that when asked what types of feelings or mood would put him at risk of sexually offending, Harmon had replied, "I don't think it was a feeling or a mood. With my daughter it was curiosity. How is the vagina made? What are the details of it? It wasn't her. It was more me. It's my want to use something to masturbate with." This response was problematic, according to Dr. Johnson, because it placed Harmon in the role of an intellectual observer and allowed him to deny and rationalize his sexual urges. Dr. Johnson also testified that Harmon's relapse-prevention plan—to not have children in his house—was problematic because his records and interview showed that he had also offended outside the home and because it placed the responsibility of not offending on the children. Dr. Johnson then connected these issues to Harmon's diagnoses: his narcissistic personality disorder and pedophilia are at play because he places himself in the role of a removed and superior observer who is entitled to use his young victims for his own purposes, while not admitting the root cause of his aberrant sexual desires. Essentially, Dr. Johnson testified that Harmon's narcissistic personality disorder makes him unable to admit to his pedophilia, and a person cannot change a behavior or address a problematic sexual urge if that person can't admit such an urge exists.

When Dr. Johnson asked Harmon about how he used to set up situations in which he could sexually offend, he became distressed and told Dr. Johnson, "I don't want these things to come into my head, because I can remember and can see the things I did in my head." Dr. Johnson testified that Harmon became visibly aroused at that point. But when he continued to answer Dr. Johnson's question, he referred to his victims as "something to

5

masturbate with," which, according to Dr. Johnson, showed that he was unable to cope with the distress of the situation until he removed the emotional component and referred to his victims as objects. When Harmon testified about this incident, he said that the reason he appeared aroused was that he was noticing that Dr. Johnson was attractive and that he was trying to redirect his thoughts from the behaviors they were discussing.

Dr. Johnson testified that Harmon would have difficulty controlling his dangerous behaviors because he denied that he had these sexual urges and rationalized them away, which would allow him to continue offending. When asked what he would do if he were alone in a room with a child, Harmon told Dr. Johnson that he would try to find an adult or "call someone." Dr. Johnson testified that this was troubling because it placed the responsibility for not offending on other adults and showed a lack of forethought and coping skills. She stated that because of his narcissistic personality disorder, Harmon's grandiose sense of self-worth made it difficult for him to admit to having poor emotional control or aberrant sexual desires, which sets him up to deny and rationalize his sexual urges.

Finally, Dr. Johnson testified about the tests she administered for Harmon's evaluation. She administered a test for psychopathy, and Harmon's results showed that he had antisocial traits but not antisocial personality disorder or psychopathy. Dr. Johnson also administered the Static-99, which psychologists use to estimate the probability that a sexual offender will reoffend; Harmon scored in the moderate-to-high-risk category. She stated, however, that because the Static-99 doesn't account for improvements an offender may have made as a result of treatment, it should be taken with a grain of salt. Instead, she said she placed more weight on the interviews.

The defense did not present expert testimony; Harmon testified in his own defense, and the State waived cross-examination. When asked about why he offended

with his daughter and granddaughters, Harmon recalled that the victims were available when he wanted sexual gratification:

"Well, I was doing it for my own gratification. I was curious. That's what I thought at the time, I was—no. No, that—no, no, no—

". . . it's really no excuse why I did it, but I . . .

"Well, the—one instan[ce] that came up at that time was—was my nephew had brought over a pornography tape. And I watched that, and then right afterwards, my daughter was available, and I molested her, and—but that's why I did it then, yes.

"Q: What about your granddaughters?

"A: Granddaughters. Well, there—it started with a—I was in my bedroom, and they— they came in and they stood in front of me, and they were completely nude. And they told me that they wanted to play something called 'Naked City.' And instead of being an adult and tell them to go get their clothes on themselves, I molested them."

Harmon acknowledged that his behavior was inappropriate but avoided taking all the blame himself:

"But forced, I didn't force them. They did come up, and they asked, and they wanted—it seemed to me like they had done it before with someone else. That's—that's what I thought at the time.

"But I wasn't—I didn't take appropriate action. But I didn't force them. I mean, I didn't send them off to get dressed or I didn't discipline myself not to molest them then. But, forced, no."

When asked about whether he could control his behavior, Harmon testified about how he had generally avoided disciplinary action in the highly structured prison

7

environment and explained the two disciplinary incidents that had occurred. In both instances, as the district court pointed out, Harmon suggested that the other people involved were at fault and that he had nothing to do with causing the altercations. When asked, "[W]hat's changed now? Why should the Court believe that anything's different than what happened back in '89 or 2004?" Harmon spoke about his experiences in prison and wanting to improve relationships with his family:

"A. Well, since that time, I've been through prison, jail, and each one of them has had their own effects on me.

"The physical—or stand in line, somebody's hitting you or pushing you, or threatening you, I was always fearing for my life in prison, my safety.

"The . . . the ostracization, you're the lowest scum of the earth, and—but—and the pain of—that I caused everyone, through my actions and my not taking responsibility to—I don't know . . .

"My loss of friends, the public knowledge that's—that is on the Internet. I mean, then I could walk around and nobody—I mean, I was invisible. I was just another person. And because it—if you—just to look at a person, you don't know what they're doing behind the scenes.

"But—and I've been—I'm scared of going back to prison. Scared of—if—if I were to [recidivate]—to re-offend, then I would never come home. You would have to lock me up forever.

"And I made a promise to my wife not to re-offend. I promised her I would be a husband that—a good husband. And I would like to keep that promise.

"And in all of that, when I think of the victims, they're feeling the same way, or worse. What I did . . . I did to—well, my daughter—we talk, and she sees me, and I can see she's—still suffers from my molestation of her.

8

"I know the victims never get over it. They—they will have problems that—[are] unforeseen. But I—I would like to be able to help them if—if they could use my help in therapy or something. I don't know. But I would like to apologize to them.

"And it's been an ongoing problem—process with my daughter, because she—I think she married an abusive husband because of me . . . .

"And—and all this, I'm sure, has affected my wife. She doesn't show it so much, but I'm sure she's feeling something that we haven't spoken to, and I'm looking forward to going to, I don't know, counseling or something, to include her in it. Not to put my control on her, but so that she knows what's happening with me.

"But this—it's just been too traumatic for me, and for everyone else. I mean, it's affected so many people that it's up—upset their lives. I think that's—that says what I feel on that."

Because Dr. Johnson was the only expert who testified and because the district court found her to be credible, it relied on her testimony to find that the State had proved Harmon was a sexually violent predator beyond a reasonable doubt. The district court also noted that it did not find Harmon's testimony credible or compelling: "[Harmon] simply is not credible in his statements of how he recognizes his weaknesses and what he will do to avoid or prevent repeating that behavior."

Harmon has appealed to this court.

ANALYSIS

*The District Court Had Sufficient Evidence to Conclude Beyond a Reasonable Doubt That Harmon Is a Sexually Violent Predator.*

Harmon argues that the evidence was not sufficient to support the district court's finding that he is a sexually violent predator. The district court (either through a judge or

9

a jury) is the factfinder, and a case in which the sufficiency of evidence is challenged comes to us only after the State has won at trial. Accordingly, since the factfinder has already found in the State's favor, we must consider the evidence in the light most favorable to the State. We then determine whether a reasonable factfinder could have found that the State proved beyond a reasonable doubt that Harmon is a sexually violent predator. *In re Care & Treatment of Williams*, 292 Kan. 96, 104, 253 P.3d 327 (2011). We do not reweigh the evidence or determine the credibility of witnesses. 292 Kan. at 104.

The Kansas Sexually Violent Predator Act, K.S.A. 59-29a01 *et seq.*, was designed to identify sexually violent predators and civilly commit them to a long-term treatment program. 292 Kan. at 104. The statutory requirements of K.S.A. 59-29a01 *et seq.*, combined with the holding in *Kansas v. Crane*, 534 U.S. 407, 413, 122 S. Ct. 867, 151 L. Ed. 2d 856 (2002), which upheld the constitutionality of the Act, impose four elements that the State must prove beyond a reasonable doubt to commit someone as a sexually violent predator: (1) the individual has been convicted of or charged with a sexually violent offense; (2) the individual suffers from a mental abnormality or personality disorder; (3) the individual is likely to commit repeat acts of sexual violence because of a mental abnormality or personality disorder; and (4) the individual has serious difficulty controlling his or her dangerous behavior. *Williams*, 292 Kan. at 106; see K.S.A. 2014 Supp. 59-29a02(a)-(e); K.S.A. 2014 Supp. 59-29a07.

Harmon doesn't dispute that the State proved the first element beyond a reasonable doubt; evidence of Harmon's 1989 and 2005 convictions was admitted at trial without objection. What Harmon challenges on appeal is the credibility of the State's expert, Dr. Johnson. Because the defense did not present any expert testimony, the district court's decision was based almost solely on Dr. Johnson's testimony. Harmon argues that Dr. Johnson's testimony was so undermined on cross-examination that it wasn't sufficient to support the district court's finding that Harmon is a sexually violent predator.

10

Most of Harmon's complaints concern certain inconsistencies in how Dr. Johnson scored two psychological tests, the Static-99 and Static-2002. Dr. Johnson testified that psychologists use these tests to predict the likelihood that a sexual offender will reoffend by comparing an individual's test results with the test results of a group of sexual offenders who have actually reoffended. She gave Harmon a score on the Static-99 that showed he was at a moderate to high risk of reoffending, and she defended her result despite knowing that two other psychologists had scored Harmon in the low-risk category. Some of the choices Dr. Johnson made in scoring these tests were strongly challenged. She never clearly explained why she had said one of Harmon's victims was a stranger on the Static-2002 when she hadn't done so on the Static-99. She merely said that the two tests had different rules for scoring, which may have accounted for the difference. Similarly, on the Static-99, she said that Harmon had never lived with a romantic partner for more than 2 years, but it was well established that Harmon had been married three times, each for more than 2 years. In addition, Dr. Johnson had difficulty independently recalling the rules for scoring the tests (though she also testified that when she scored tests like these, she would do so with the rules directly in front of her).

While this line of cross-examination may have undercut Dr. Johnson's testimony, especially about the Static-99 test result, in her direct testimony she said that her ultimate conclusion that Harmon is a sexually violent predator was based primarily on her interviews with him, not on the results of the Static-99. She stated she wouldn't rely solely on the Static-99 and that the results of such a test should be taken "with a grain of salt." Harmon also takes issue with Dr. Johnson's interpretation of the definitions provided by a standard psychological text, the Diagnostic and Statistical Manual of Mental Disorders, fourth edition (DSM-IV-TR), for exhibitionism, voyeurism, and frotteurism, but Dr. Johnson's testimony about her interpretation of those definitions was reasonable and uncontroverted.

11

Ultimately, Harmon's argument on appeal is that the evidence was insufficient because Dr. Johnson wasn't credible. But we do not make credibility determinations; we can ask only whether the district court's decision was supported by substantial evidence. *Williams*, 292 Kan. at 104. Despite the specific inconsistencies that Harmon pointed out, we are still left with substantial testimony from Dr. Johnson, who had a Doctor of Psychology degree in clinical psychology and was working under the supervision of a fully licensed psychologist. She spent about 28 hours working on Harmon's case, including 5 hours of interviews. Based on all of that, she concluded that he was likely to reoffend. Considering her testimony as a whole, in the light most favorable to the State, we are convinced that a reasonable factfinder could have relied on that testimony to conclude that the State proved beyond a reasonable doubt that Harmon is a sexually violent predator.

We affirm the district court's judgment.