Nancy Steffen Rahmeyer, P.J., dissenting
I must reluctantly dissent; I say reluctantly because I realize that it is not popular to defend someone who has been diagnosed by the Department of Mental Health as a pedophile. I must dissent though because I believe diagnosis as a pedophile alone does not warrant a permanent commitment to the Department of Mental Health pursuant to section 632.495. I do not believe the statute would stand as applied without a further finding that there is sufficient evidence that Aaron Sebastian ("Sebastian") is a sexually violent predator. I find that evidence to be woefully lacking in this case.
As noted in the majority opinion, Sebastian pled guilty to first-degree attempted statutory sodomy[1] when he was nineteen-years-old and was sentenced to a six-year imprisonment in the Department of Corrections. Sebastian's past involved abuse, neglect, parental drug abuse, and abandonment. He lived with his mother in his early life and never had contact with his biological father. Sebastian's biological mother had two other children who were his half-siblings, C. and B. Around age seven, Sebastian and his half-brother were removed from their trailer-home due to abuse, neglect, and malnutrition. Sebastian was going to school with wet, soiled diapers; he was very skinny and malnourished. He failed the first grade because of the moves and separation from his mother. He and his brother were sent to a foster home where he was also abused and forced to sleep naked; he and his brother were hung on hooks and abused by the foster parents. Sebastian appeared to have post-traumatic stress disorder, had nightmares, and was very insecure.
Sebastian's mother offered to sell the boys for $5,000 each to the foster mother. Nevertheless, at some point Sebastian returned to his mother's home prior to turning eighteen. When Sebastian was eighteen, he entered the room of the eleven-year-old niece ("Victim") of his mother's boyfriend, to find her sleeping. From there, Sebastian unbuttoned Victim's pants and started to put his hand down her pants. Victim woke up and told Sebastian to stop, which he immediately did. After Sebastian attempted to touch Victim, she *652 called her mother and grandmother to tell them what had happened. Following this, Sebastian was charged and pled guilty to the index offense.
Standard of Review for Submissibility of a Case
To make a submissible case, the State bears the burden of proving by clear and convincing evidence that Sebastian:
(1) has committed a sexually violent offense; (2) suffers from a mental abnormality; and (3) this mental abnormality "makes [him] more likely than not to engage in predatory acts of violence if not confined in a secure facility."
Kirk v. State , 520 S.W.3d 443, 448-49 (Mo. banc 2017) (quoting section 632.480(5) ).
There is no question that Sebastian's offense qualifies as a sexually violent offense pursuant to section 632.480(5)(a). It is the question of whether, pursuant to section 632.480(2), he suffers from "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes [him] to commit sexually violent offenses in a degree constituting [him] a menace to the health and safety of other[s]" that troubles me. The methods of making that finding and underlying support for the decisions used by the State witnesses is troubling as a matter of law. The witnesses purport to use the same diagnostic tools to predict whether it is more likely than not that Sebastian will reoffend. Interestingly, the two doctors do not arrive at the same "score" according to the scale, but instead rely upon various other factors to support their conclusions. It is the underlying factors that I take issue with.
Missouri courts have routinely held that, although not included in the statutory definition, serious difficulty controlling behavior is an element of "mental abnormality" that must be proven by the State. See, e.g. , Murrell v. State , 215 S.W.3d 96, 106 (Mo. banc 2007) (listing serious difficulty controlling behavior as an element of "mental abnormality" under section 632.480 and Kansas v. Crane , 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002) ). Therefore, while "pedophilia" alone satisfies the statutory definition, it does not satisfy the "serious difficulty controlling behavior" requirement. The next step must be whether sufficient evidence and the reasonable inferences from that evidence established that Sebastian's mental abnormality causes him serious difficulty controlling his behavior. See Thomas v. State , 74 S.W.3d 789, 790-91 (Mo. banc 2002).
During oral arguments, the State listed four factors that the experts used to determine whether Sebastian had serious difficulty controlling his behavior. These four factors included: (1) the index offense; (2) an undetected offense which Sebastian disclosed during his treatment; (3) the length of time it took Sebastian to complete sex offender treatment; and (4) Sebastian watching Sia's "Chandelier" music video. While the State failed to mention any other factors during oral argument, it appears from the trial transcript that the State's experts also relied on two additional factors: (1) Sebastian's babysitting fantasy; and (2) Sebastian's Missouri Sex Offender Program ("MOSOP") group therapy. After reviewing the testimony in regards to all of these factors, I do not believe sufficient evidence was adduced that Sebastian had serious difficulty controlling his behavior.
Regarding the index offense, Dr. Kircher testified that Victim was not prepubescent according to the Tanner stages.[2] Victim *653 had started her period at age nine; she had an estrogenized hymen; and her breast development and pubic hair fell into Tanner Stage 4. Additionally, Victim was 5'4'' and weighed 136 pounds. Dr. Kircher testified that when making a pedophilia diagnosis, the most important thing to consider is the person's physical development rather than their age. Further, while Sebastian was committing the index offense, as soon as Victim said "stop," Sebastian stopped. Sebastian did not continue to try to touch Victim; he did not try to force himself on her, and physical intervention was not necessary to stop him.
As for the "undetected offense," disclosed during sex offender therapy, Sebastian stated to the experts that he had previously committed similar offenses of attempting oral sex against other victims while he was a juvenile. Dr. Kircher recounted in notes of her interview with Sebastian that Sebastian stated, "when I was 14 or 15 I victimized [C.], my sister; [E.], the daughter of my mom's friend; [and Victim], on different occasions, in the same way." Dr. Kircher indicated that the prior indication of a juvenile offense was simply used to determine whether Sebastian is more likely than not to engage in sexually violent predatory behavior because by definition to be diagnosed with pedophilia, the individual must be 16 or older. Also, Sebastian stated, "[w]hen I was 17, I victimized [K.], 7, the daughter of Mom's friend, by pulling down her pants and penetrating her vagina with my tongue." There were no criminal charges on any of the self-reported events.
Dr. Witcher considered additional factors, such as the juvenile offenses, to note the lack of empathy and lack of judgment. When considering this offense, the experts completely relied on the veracity and truthfulness of Sebastian while in treatment; however, the experts agreed that a person's juvenile record is not used to determine a mental abnormality. Aside from the self-revealed claims of his behavior as a juvenile, there is no evidence in this "undetected offense" that indicates that Sebastian groomed the victim or that he was violent in the offense or, most importantly, that Sebastian had serious difficulty controlling his behavior as an adult.
Next, Dr. Witcher relied on the length of time it took Sebastian to complete his sex offender treatment for her diagnosis. It took Sebastian eight months to complete the four-month juvenile sex offender program, and eleven months to complete the nine-month MOSOP program. The length of time to complete the program cannot be used against Sebastian to prove that he has serious difficulty controlling his behavior. There are many reasons for a delay in completing a program and there is no evidence that Sebastian was delayed because he was resistant to training. Though it took him a few extra months to complete each program, he did what was required of him, which was to successfully complete each program. Moreover, the length of time to complete the sex offender treatment program is not indicative of Sebastian's "serious difficulty controlling his behavior."
The next element that both of the experts believed supported a finding that Sebastian had serious difficulty controlling his behavior was his viewing of Sia's "Chandelier" music video. Dr. Kircher testified:
The music video is essentially a girl; she's 11 years old. She was a girl who was popular off the TV show "Dance Moms." She's-I don't know the dancer's name. She's slender, no breasts, flat-chested, straight across the hips; and she's wearing a flesh-colored bodysuit, doing essentially an interpretive dance throughout an empty house.
*654 Dr. Kircher then testified that it was problematic that Sebastian was watching this music video, because "if he's watching this video, then he's viewing something that's really, really close to child porn."[3] Dr. Witcher testified that the girl in the music video was "prepubescent-within the early pubescent stages, just looking at her."
If Dr. Kircher's view is correct, then approximately 1.8 billion viewers are viewing child pornography. Mainstream television shows such as Ellen DeGeneres, Dancing with the Stars, and the Grammys are contributing to child pornography. Public like of the video aside, there is no allegation that Sebastian downloaded, in some way, the video for inappropriate use and child pornography. In fact, Sebastian originally saw the music video while watching network television.
Additionally, this music video was played on a television located in the common room of MOSOP, where Sebastian did not have control over the television. Dr. Kircher testified that when the music video would come on, Sebastian would stop watching the video and instead look at the ceiling. Dr. Kircher viewed this action as insufficient, because Sebastian did not leave the room. When asked whether Sebastian should have left the room and returned to his bunk, Dr. Kircher stated that that would have been considered isolating, which is not something that is recommended. Essentially, Sebastian was put in a lose-lose situation-whether he stayed in the room with the music video or he went back to his bunk, both were going to be considered wrong. Simply watching a music video-especially one that is current in today's pop culture-does not assist in finding that Sebastian's pedophilia causes him serious difficulty controlling his behavior.
Next, while completing MOSOP, Sebastian was charged with identifying a fantasy and determining how not to act out on it. The fantasy that Sebastian chose to identify involved babysitting his future, non-existent niece. However, Dr. Witcher and Dr. Kircher both used this fantasy as evidence in their diagnosis. To rely on this fantasy as part of Sebastian's diagnosis would be counterintuitive. If Sebastian had not given his treatment providers an acceptable response, he would not have been able to move forward with his sex offender program, or worse yet, Sebastian would not have been able to gain the tools needed to handle this potential future issue. However, by Sebastian complying with MOSOP and truly attempting to gain the needed skills to deal with future instances, he gained nothing more than having his compliance to the task in therapy used against him.
Lastly, Dr. Kircher also considered Sebastian's group therapy sessions when making her diagnosis. She testified that during Sebastian's MOSOP group therapy sessions, Sebastian would become aroused listening to other patients' stories and felt that he needed to have sexual gratification. Therefore, this distress over these urges would cause him to reoffend. When Dr. Kircher, however, was told to give examples of Sebastian acting out on other patients' fantasies that he heard while in group therapy sessions, Dr. Kircher only provided one fantasy, which did not involve a prepubescent victim but rather one involving a "little bit older teenage girl." Thus, since this fantasy involved an older girl, Sebastian's mental abnormality of pedophilia *655 cannot be linked to the idea that it caused him serious difficulty controlling his behavior.
I recognize that this is the extremely rare case in that the experts' testimonies do not meet the standard for showing that a mental abnormality causes the individual serious difficulty in controlling the individual's behavior. However, considering all of the factors that the experts used in making this determination, the evidence is simply insufficient. The State did not provide substantial evidence that the trier of fact could reasonably use to decide the case. See In re Care and Treatment of Cokes , 107 S.W.3d 317, 323 (Mo. App. W.D. 2003). Because the State did not provide sufficient evidence of an element that is necessary to Sebastian's commitment as an SVP, I do not believe the judgment can stand.
I would reverse the judgment committing Sebastian.

See section 566.062, RSMo. Cum.Supp. 2006; case number 1131-CR02938-01.

"Tanner Staging ... is an objective classification system that providers use to document and track the development and sequence of secondary sex characteristics of children during puberty." Mickey Emmanuel, Brooke R. Bokor, Tanner Stages, https://www.ncbi.nlm.nih.gov/books/NBK470280/ (last visited August 6, 2018.)

The official music video has over 1.8 billion views, including over 450,000 comments. https://youtu.be/2vjPBrBU-TM (last viewed August 6, 2018). The music video for Chandelier is the 29th most-viewed YouTube video of all time. https://en.wikipedia.org/wiki/List_of_most-viewed_YouTube_videos (last visited August 6, 2018).