**Affirmed and Memorandum Opinion filed January 5, 2023.**



In The

# Fourteenth Court of Appeals

## NO. 14-21-00070-CV

## IN RE THE COMMITMENT OF KEVIN LEE THEDFORD

**On Appeal from the 182nd District Court
Harris County, Texas
Trial Court Cause No. 0895230-0101Z**

## MEMORANDUM OPINION

This is an appeal from a civil commitment order, where a jury found that appellant Kevin Lee Thedford is a sexually violent predator as defined in the Texas Health and Safety Code and thereby subject to civil commitment.

Thedford complains that (1) the evidence presented to the jury at trial was legally insufficient to support its finding that he suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence, and (2) the trial court erred by excluding his cross-examination of the State's expert as to her opinion whether Thedford would choose to reoffend in the future.

We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

When Thedford was eighteen-years old he was charged with aggravated sexual assault of a child under fourteen years of age, a charge based on allegations that he was discovered performing oral sex on a nine-year-old boy. Three years later, while on probation for that offense, Thedford was alleged to have raped a nine-year-old girl in a McDonald's bathroom. His probation was revoked, and he agreed to serve a twenty year prison sentence for his conviction of the two offenses.

Eighteen years later, two years before his release date, appellee, the State of Texas, commenced this action declaring Thedford a sexually violent predator and requesting that Thedford be civilly committed for treatment and supervision under Chapter 841 of the Health and Safety Code. The Civil Commitment of Sexually Violent Predators Act (the "SVP Act") provides a civil commitment procedure for the long-term supervision and treatment of sexually violent predators. Tex. Health & Safety Code Ann. § 841.001. Under the SVP Act, a person is a sexually violent predator if the person "(1) is a repeat sexually violent offender; and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." *Id.* § 841.003(a).

Thedford was evaluated by two experts to determine whether Thedford suffered from a behavioral abnormality makes him likely to engage in a predatory act of sexual violence. The experts who evaluated Thedford testified at his trial affirmatively as to the issue and explained the reasons for their conclusions. At the close of trial, the trial court entered a directed verdict that Thedford was a repeat sexually violent offender and instructed the jury that they were only required to answer whether Thedford suffered from a behavioral abnormality that made the

2

person likely to engage in a predatory act of sexual violence.[1]

The jury answered "Yes".   On November 13, 2020, the trial court entered a judgment committing Thedford to treatment at a secure correctional facility until the behavioral abnormality altered to the extent that Thedford is no longer likely to engage in a predatory act of sexual violence. Thedford appeals.

## II. LEGAL SUFFICIENCY OF THE EVIDENCE

In his first issue, Thedford complains the evidence is legally insufficient to support a beyond-a-reasonable-doubt finding that he has "a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence."

**Standard of Review**.   When reviewing legal-sufficiency in civil cases where the prosecution's burden of proof is beyond a reasonable doubt, the reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020). The court must "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder

---

[1] The single question posed to the jury was posed as follows: "Do you find beyond a reasonable doubt that KEVIN LEE THEDFORD is a sexually violent predator?" To inform their decision, the jury was provided instructions tracking the relevant statutory definitions under the Act, including definitions for a "Sexually Violent Predator" and "Behavioral Abnormality".

> You are instructed that a person is a **"Sexually Violent Predator"** for the purposes of Chapter 841 of the Texas Health and Safety Code if the person:
>> 1. is a repeat sexually violent offender; and
>> 2. suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence.
> * * *
> **"Behavioral Abnormality"** means a congenital or acquired condition that, by affecting a person's emotional or volitional capacity predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person.

could do so" and "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). The court may not disregard undisputed facts that do not support the finding. *Id.* at 674.

**Trial Evidence**. Three witness testified at trial: Thedford, and two experts, Michael Arambula, M.D. and Anoinette McGarrahan, Ph.D..

*Thedford*. Thedford was asked about his record of sexual misconduct. He admitted that when he was 17, he and his girlfriend from his special education class who he had known for over four years were arrested for public lewdness for having sex in the high school bathroom. Thedford believes his girlfriend was imprisoned for over four years. Thedford testified that he spent "15 minutes" in jail and officers talked to him and his mom, warning Thedford not to have sex in a public area.

Thedford also discussed the two events that prompted his 20-year prison sentence. Regarding the first offense, Thedford admitted that he engaged in oral sex with his nine-year-old neighbor. Thedford testified that "[the boy] came to me to be his babysitter." He testified that he knew the boy's parents were home and ultimately admitted that the boy's stepmother had walked in when it was occurring. Thedford recalled discussing with doctors that he had known the child to be promiscuous with other children his age and that he had not told anyone about that, and that the child had probably asked him to perform sex. Thedford testified that he had been friends with the child:

> *Q.* Okay. Do you feel like you were being a good friend to [the boy] by sexually offending against him?
>
> *A.* Well, not just about that. I helped him in other ways, too. Not just that.
>
> Thedford testified that after committing the first offense he did not think he

would commit another offense. Before detailing the second offense, he testified that after three years of doing well on probation, he "was sliding back,": "I just snapped".

In the second offense, Thedford was charged with "knowingly causing the penetration of the female sexual organ of. . .Complainant, [a nine year-old-girl] (person younger than fourteen. . .) by placing his penis and finger in the female sex organ of the Complainant" while working at McDonald's. Though he had pled guilty to the offense, at his commitment trial Thedford essentially denied fault in the rape of his manager's nine-year-old daughter inside a bathroom stall at McDonald's . He testified that the nine-year-old girl grabbed his hand and wanted him to put it on her vagina. He testified that it was his fault "for not trying to, you know, kind of push her a little bit. Not, like, hard or nothing. Like, say stop. Like -- but tell her, This is not right. This is wrong. But I didn't do that."

Thedford insisted that that his "old self" had died, and was "dead and gone. Done[,]" and that he had changed when he was in prison. During his time in prison, Thedford has not committed another offense against a child. Thedford admitted that he had been given a disciplinary infraction when he performed masturbation on another inmate in the prison dining hall. Thedford was reluctant to identify the act as sex.

*Arambula*. The jury heard the testimony of Dr. Arambula, a board-certified forensic psychiatrist hired by the state to perform the behavioral abnormality evaluation of Thedford. Arambula testified that he has performed roughly 175 behavioral abnormality evaluations for the State, and explained that his conclusion was not predetermined upon being hired by the state. He explained that among those evaluations, in roughly 25 to 30 of the cases, he determined the individual

did not suffer from a behavioral abnormality.[2] Thedford, however, was not among that smaller group. Ultimately, Arambula concluded that Thedford has a behavioral abnormality that makes Thedford likely to engage in a predatory act of sexual violence in the future, and further testified about how he arrived at that conclusion.

Arambula was asked about the statutory definition of "behavioral abnormality." He explained that the definition prompts him to consider how the subject's "brain is functioning, making decisions, and looking at risks and benefits associated with their behavior." He explained that the statutory language "*menace to the health and safety of another*" narrowed his understanding that the group falling under the definition was a very small subset of sex offenders who are particularly dangerous."

Dr. Arambula testified about the methodology that he used in arriving at his conclusion. Arambula explained that he first performs a clinical evaluation ("general psychiatric evaluation") of the subject, performs a historical evaluation (reviewing records indicating subjects developmental history, social history, school records) and takes a medical history (surgical, medical, mental health, including drugs and alcohol). Dr. Arambula testified that when he evaluates someone for a behavioral abnormality he reviews any available records of that individual, including the results of psychological tests that previous evaluators had administered, including social, school history, any depositions in the case, and

---

[2] Arambula testified about his extensive training and experience in the field of forensic psychiatry. Arambula testified that he spent close to 15 years teaching in the field of forensic psychiatry. Additionally, he testified to extensive public service as the chair of the state's medical ethics committee, that that two Texas governors have appointed him to serve on the Texas Medical Board and that he has served for over two years as president of the board. Arambula was educated on the subject of sexual behaviors during his fellowship training in Chicago and since then has taught on the subject and trained residents. Arambula does not currently treat sex offenders but has previously worked as a licensed offender treatment provider.

prison administrative records. In this case, Dr. Arambula reviewed, in addition to other information, investigative reports and legal records associated with Thedford's prior offenses, Thedford's deposition testimony, and his administrative records from the Texas Department of Criminal Justice (TDCJ), including a behavior abnormality assessment report administered by a psychologist for the TDCJ. Dr. Arambula explained that this is the same methodology and these are the same kind of records used by other experts in his field when formulating an opinion in civil commitment cases.

Arambula's forensic analysis included the review of data from his evaluation, other evaluations in the file, and from other records associated with Thedford. He explained:

> Beyond that, then I focus on the forensic matters which in these cases are the sexual offenses. And I try to obtain as much information as the individual remembers about what happened, what led up to it, why did they do this, what occurred during the offense, and then what did they do afterwards. In other words, I look at the continuum here. If it -- in these cases, since they are repeat offenses, then I try to understand how long in between, why did it not continue, why did it pick back up. And, again, I go through the same details that the individual will share with me so I have an understanding of why they did what -- why they did -- why they did what they did.

> And then I'll look at investigative records related to their offenses, some of the legal records, what they've done in prison. So, I look at what kind of courses and classes they've taken to improve their job skills, personal skills. And then I look at treatment records to see if indeed they've taken sex offender treatment and to better understand how much they understand about their illness so that way they can manage it in the future. And then ultimately I put all that together and then arrive at an opinion regarding behavioral abnormality

Arambula diagnosed Thedford with paraphilic disorder (a type of sexual deviance). Based on his two-hour evaluation of Thedford, guided by his education, training, experience, and the methodology that he employed in this case, he

concluded that Thedford suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence.

Arambula testified that the severity of appellant's sexual deviance was the most significant risk factor in his evaluation. He explained that this assessment was significantly attributed to age and appearance of Thedford's past targets–as having "no secondary sex characteristics."[3] Arambula also discussed his concern that appellant blamed the victims: "it's an example of not accepting responsibility, not being aware of their behavior when the investigation revealed the exact opposite." Arambula suggested that because he is a doctor, bound by a different code of ethics than lawyers and judges, he does not disregard allegations in the criminal records that might not be accounted for in the criminal charge and judgment. For example, in the file relating to Thedford's first offense, where the conviction was based on one incident, he explained that statements had suggested the occurrence happened over ten times beginning five years previously, and that Thedford had suggested the conduct was acceptable because the boy had been "messing around with other kids".

Arambula discussed his concern regarding the risk associated with the escalation of physical violence between the first and second offense. He described the second offense as desperate and aggressive, and testified that the records indicated Thedford had followed the nine-year-old girl into a bathroom stall in the girl's restroom, covered her mouth, knocked her to the ground and then raped her.

Arambula testified that the second incident presented facts that Thedford's volitional capacity was affected because he had already been in trouble for public lewdness as a child, pled guilty to a sexual offense, and knew he was under

---

[3] Arambula described this phrase to mean children at an age with a "body shape and image like a stick figure", "that haven't started developing yet."

supervision. In short, "he knew it was wrong."

Arambula explained that in evaluating the history of appellant's conduct in prison, the consensual incident occurring with another inmate in the chow hall was noteworthy as unusually "risky" conduct due to its public nature. He explained that "yes, sex goes on in prison; but in public, you'll get caught, [and] punished."

*McGarrahan*. Dr. Antoinette McGarrahan, a psychologist specializing in forensic psychology and neuropsychology, was also hired to provide her professional opinion[4] as to whether Thedford has a behavioral abnormality and is likely to engage in future predatory acts of sexual violence. Like Arambula, McGarrahan concluded that Thedford has a behavioral abnormality that makes him likely to engage in a future predatory act of sexual violence.

McGarrahan testified that the methodology she used in evaluating Thedford involved reviewing records, which typically includes prior convictions, offense reports, witness and victim statements, medical records, institutional records, educational records, and judgments and sentences from the courts where the individual faced charges. McGarrahan testified that she normally interviews the individual if he agrees to a face-to-face evaluation, and also conducts a mental status examination. Her methodology incorporates the use of actuarial instruments, which she described as "tools that are utilized in these sorts of cases, to look at which risk factors the individual has or doesn't have to determine their risk of recidivism."

McGarrahan described risk factors from her assessment of Thedford, including sexual deviance in the form of sexual interest in children, lacking an

---

[4] McGarrahan has postgraduate degrees in forensic psychology and neuropsychology and teaches a forensic psychology course to doctorate students since 2005. She works on various types of cases and has been performing behavioral abnormality evaluations since 2000.

9

emotionally intimate relationship with an adult in the past, poorly managed anger, and what she called "internal grievance thinking" or "the victim stance" (based on his denial of responsibility for prior acts), "poor coping skills", and Thedford's inability to avoid trouble while under supervision or while in an institutional setting.

## *Analysis*

On appeal, Thedford raises points that even if accepted would not tip the scales in Thedford's favor. In one point, Thedford acknowledges that he should have enrolled in a sex offender treatment class as part of his probation, but also contends that he was not required to do so by his probation officer and that there was no evidence that he was offered a sex offender treatment program during his current incarceration. Thedford contends "it obviously mattered" to the jury because the jury asked during deliberations if such treatment had been offered. We are reluctant to decipher, like Thedford, any meaning from either the jury's question or the fact the jury asked the question, as one could equally surmise that the jury's verdict reflects that the jury considered and eliminated doubts with respect to the availability of sex offender treatment in prison. We also note that Arambula testified that Thedford is an untreated sex offender while McGarrahan testified that Thedford had received some treatment, and some counseling in a group home, but continued to offend even while in treatment. Whether he received any treatment or not, the record shows that Thedford never *completed* a sex offender treatment program.

Thedford told the jury that he does not need treatment — that he changed; that he believes it is safe for him to be around children when he is released from prison. Given his history, various contradictions cited in the criminal records by the experts, the testimony of the experts and Thedford, the jury was free to

10

disregard his testimony that Thedford had changed and believe McGarrahan's testimony that Thedford does not have the tools he needs to manage and control his sexual deviance.

Thedford argues that "it is highly likely that Thedford would not be able to effectively participate in a traditional sex offender treatment program due to his intellectual disability and not a behavioral abnormality." Ultimately, Thedford accepts the proposition that he "lacks emotional or volitional control" but insists that the experts, the jury and the courts should associate evidence of Thedford's past misconduct with Thedford's intellectual limitations rather than his behavioral abnormality. Thedford presumes the two (intellectual disability and behavioral abnormality) are mutually exclusive conditions but offered no evidence or meaningful argument to support his proposition. However, even if there is some evidence that Thedford suffers from some intellectual impairment, ample evidence—testimony offered from each of the three witnesses—illustrated Thedford's pedophilia and his impaired volition. *In re Commitment of Hebert*, 578 S.W.3d 154, 158 (Tex. App.—Tyler 2019, no pet.)(finding behavioral abnormality and noting intellectual deficit).

Thedford himself testified, although he believed he had control of himself after the first offense, he "just snapped." In further support of the jury's verdict, both experts provided the jury with evidence of the likelihood of Thedford's behavioral abnormality that makes him likely to engage in a predatory act of violence that remains uncontradicted.

After considering the evidence presented to the jury in the light most favorable to the verdict, we hold that a rational trier of fact could find that Thedford has a behavioral abnormality which impairs his volition and that makes him likely to engage in a future predatory act of sexual violence. *See* Tex. Health

& Safety Code Ann. § 841.003(a); *Short*, 521 S.W.3d at 919.

We therefore overrule Thedford's first issue.

### III. EXCLUSION OF EVIDENCE

In his second issue, Thedford raises one or more evidentiary complaints based on trial court's rulings sustaining the State's objections to Thedford's trial counsel's cross-examination of the State's expert, Dr. McGarrahan.

*Standard of Review*. We review the evidentiary rulings of the trial court under an abuse-of-discretion standard. Trial courts have discretion in evidentiary rulings, and we will uphold such rulings if they are within the zone of reasonable disagreement. *In re Commitment of Grice*, 558 S.W.3d 323, 327 (Tex. App.—Houston [14th Dist.] 2018, no pet.) citing *Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 545 (Tex. 2018). A trial court abuses its discretion when it acts arbitrarily, without regard to any guiding rules and principles. *In re Commitment of Dunsmore*, 562 S.W.3d 732, 739 (Tex. App.—Houston [1st Dist.] Oct. 18, 2018, no pet.).

*Record of the Evidentiary Ruling*. During the examination of McGarrahan, Thedford's attorney began a series of questions about the relative volition of sex offenders generally and Thedford specifically, with respect to future predatory offenses. Thedford's attorney first asked McGarrahan, "If Kevin reoffends in the future, will he choose to do so?" Without an intervening objection, McGarrahan testified, "He might or he might not." No objection followed, until after the next question, when trial counsel inquired into the basis of the opinion and asked, "What are the factors that he might or might not?" The State's attorney objected to the question on "relevance and speculation" grounds, and the trial court sustained the objection based on speculation.

Thedford's counsel then asked a generic version of the first question that had been answered without objection, asking: "Do sex offenders generally choose their behavior?" McGarrahan responded, "I don't think I can speculate on what is going through the mind of a sex offender at a particular time. I don't have any way to determine that." The State did not object to either the question or answer. Thedford's counsel then followed by framing the same question specifically as to Thedford:

> *Q.* Okay. So, you don't know whether he'll choose to reoffend or not. If he reoffends, you don't know whether he'll choose to reoffend or not. If he reoffends, will his re-offense be a product of free will?

This prompted the following objection and discussion:

> *MS. WHITTMORE:* Objection. Again, speculation. And also it's confusing.
>
> *MR. BENNETT:* She's here as an expert on this subject, your Honor. Surely she knows whether choice will be a matter -- it will be there or not.
>
> *THE COURT:* Say your question again because I think it's -- I think that's what drawing the objection. What is your question exactly?
>
> *MR. BENNETT:* If somebody like Kevin chooses -- excuse me. If somebody like Kevin reoffends, is he going to choose to do so. She's an expert on psychology and on neuropsychology. Surely she knows what a choice is and what a non-choice -- a behavior that's not chosen.
>
> *THE COURT:* But the problem I think she's having -- and I usually don't speak with this -- is that you're guessing. She's speculating as to what he's going to choose to do. But if you were to like --
>
> *MR. BENNETT:* Well, would in general be --
>
> *THE COURT:* There you go. Hypothetically.
>
> *MR. BENNETT:* Thank you.
>
> *Q. (BY MR. BENNETT)* Hypothetically, Doctor, if a sex offender reoffends, hypothetically, does he or she choose to do that?
>
> *A.* I think that's a philosophical question that I cannot -- I cannot be in

the mind of sex offenders or a particular sex offender to say how or why they do what they do.

Questioning continued until the State objected to Thedford's counsel's questions to McGarrahan based on legal standards with reference to Texas statutes and the United States Supreme Court's decision in *Kansas v. Crane*. 534 U.S. 407, 411, 122 S. Ct. 867, 869, 151 L. Ed. 2d 856 (2002). The record does not contain any specific question that Thedford's counsel sought to ask (and was precluded from asking McGarrahan), but the record shows that Thedford's counsel explained the to the court that the basis of his questions was to inform the jury that Texas's statute authorizing civil commitment based on behavioral abnormalities affecting "emotional or volitional" capacity conflicts with *Kansas v. Crane* which required at least some lack-of-control determination. The State argued to the court that the issue before the jury was limited to proving that Thedford has a congenital or acquired condition that affects his emotional or volitional capacity. The court sustained the State's objection.

In summary, liberally construing his trial objections and his argument on appeal, Thedford complains that the trial court erred in sustaining objections to three categories of questions: (1) whether, if Thedford committed a predatory offense in the future, such offense would be an act of volition; (2) the basis, or factors supporting, McGarrahan's answer to the first question, that such a future predatory act by "[Thedford] might or he might not" be an act of volition; and (3) unspecified further questioning aimed at illustrating that the Texas statute conflicts with constitutional authority.

*Analysis*. First, Thedford complains that the trial court erred in sustaining objections to specific and generic questions as to whether, if Thedford (or any sexually violent predator) committed a predatory act in the future, that act would be a volitional act. Even accounting for her field of expertise, there was no basis in

14

the record for McGarrahan to respond precisely to the questions asked; the questions asked McGarrahan to speculate as to Thedford's (or another's) state of mind at the time of a possible future offense. This would, as McGarrahan testified, be mere speculation. *See Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 786 (Tex. 2020), reh'g denied (Oct. 2, 2020)("speculative [expert] opinion testimony is not relevant evidence because it does not make the existence of a material fact more or less probable").

Second, Thedford complains that he was prevented from asking the follow-up question– "What are the factors that he might or might not [be exercising free will upon committing any future predatory offense]? Again, we find no error. The trial court would not have abused its discretion in refusing the testimony on the basis that the question was confusing or speculative, and would have elicited a response that would only confuse the jury. *See Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d at 786.

Finally, Thedford failed to preserve a complaint that the trial court refused to permit questions aimed at illustrating that the SVP Act conflicts with constitutional authority. In the course of discussions at the bench, appellant never detailed for the court or opposing counsel what particular questions he sought to ask McGarrahan or what response he expected to obtain. This would be particularly important, because this court has previously addressed the *Crane* case and has found similar constitutional challenges to be unavailing. *In re Commitment of Wirtz*, 451 S.W.3d 462, 465 (Tex. App.—Houston [14th Dist.] 2014, no pet.)("the *Crane* court focuses "the constitutional analysis on the seriousness of the abnormality and the seriousness of the danger to society posed by the abnormality, and not fundamentally on the nature of the abnormality as 'volitional, emotional or cognitive.'"). Without a more detailed explanation as to what testimony he sought

to obtain (or at a minimum the questions he sought to ask), we cannot conclude that the trial court was made aware directly or by context of the substance of the anticipated testimony. Tex. R. Evid. 103(a)(2)("if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context."); Tex. R. App. P. 33.1; *Garden Ridge, L.P. v. Clear Lake Ctr., L.P.*, 504 S.W.3d 428, 439 (Tex. App.—Houston [14th Dist.] 2016, no pet.)("primary purpose of making an offer of proof is to enable an appellate court to determine whether the exclusion of the evidence was erroneous and harmful").

Having addressed each of the sub-points Thedford raises under his second issue, we overrule appellant's second issue.

## IV. CONCLUSION

Having overruled each of appellant's issues on appeal, we affirm the trial court's judgment.


/s/    Randy Wilson
Justice

Panel consists of Justices Wise, Poissant, and Wilson.