# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of | No. 57771-2-II |
| DARRICK LANG HUNTER, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—Darrick Hunter has a long history of sexual violence against children, including child sex abuse convictions dating back to 1986. After serving his most recent child sex abuse sentence in an Oregon prison, Hunter moved to Washington to flee parole. Hunter, who was in his late thirties, then began approaching teenage girls and attempting to trick them into fictitious modeling interviews. After the girls reported Hunter's modeling ruse to police, Hunter was charged and convicted of four counts of felony communication with a minor for immoral purposes and one count of failing to register as a sex offender.

While Hunter was confined for these crimes, the State petitioned to involuntarily commit him under Washington's sexually violent predator (SVP) statute, chapter 71.09 RCW. To make the required showing that Hunter was presently dangerous, the State needed to show that Hunter's most recent conviction was for a "[r]ecent overt act." RCW 71.09.020(13).

The State moved for a pretrial ruling that Hunter's most recent convictions were for recent overt acts as a matter of law. In its materials supporting the motion, the State discussed some prior uncharged and unproven allegations against Hunter in addition to his prior convictions. The State also relied on its expert's report, which diagnosed Hunter with two paraphilic disorders. The trial

court granted the State's motion, and Hunter's case proceeded to trial at which the State was not required to prove that Hunter committed a recent overt act. The jury found Hunter to be a sexually violent predator beyond a reasonable doubt and the court ordered his civil commitment.

Hunter appeals the trial court's conclusion as a matter of law that his most recent convictions were for recent overt acts, removing the issue from the jury. He argues that the trial court erred by considering contested allegations that were not the basis for prior convictions and by resolving disputed issues of fact related to his mental condition. Furthermore, Hunter argues that the question of whether his convictions were for recent overt acts should have been decided under the clear and convincing evidence standard. The State responds that these arguments should not be considered because he raises them for the first time in this appeal.

We agree with the State and affirm Hunter's commitment because Hunter failed to alert the trial court to any of his arguments and has not shown any manifest constitutional error that would entitle him to raise his arguments for the first time in this appeal.

FACTS

I. BACKGROUND

A.    History of Sex Abuse

Before moving to Washington, Hunter committed at least four sex crimes against children in Oregon between 1986 and 1996. The victims of these crimes were children under 13 years old, who Hunter accessed through babysitting or through his church. Hunter pleaded guilty to three of these crimes and was found guilty of the fourth crime after a bench trial on stipulated facts.

Hunter's first conviction was for sexually abusing TT when Hunter was 17. Hunter was babysitting TT, a seven- or eight-year-old girl, when the abuse occurred. Hunter admitted touching TT's buttocks in a sexual manner, pleaded guilty to one count of first degree sex abuse, and

received five years' probation. During probation, he was required to complete therapy and counseling for sex offenders and to "have absolutely NO contact whatsoever with children under the age of sixteen years without proper supervision of his probation officer." Clerk's Papers (CP) at 88.

The month after entering his guilty plea for abusing TT, Hunter sexually abused KM, a young boy who Hunter babysat. Hunter pleaded guilty and acknowledged "subject[ing] a person under the age of 12 years to sexual contact." CP at 91. *But see* CP at 791-803 (in deposition, Hunter denied all the allegations of sexual abuse made by KM). Hunter received an indeterminate sentence of two-to-five-years imprisonment, suspended for a five year probationary period. During probation he was again ordered to complete therapy and counseling for sex offenders. He was also ordered to have "absolutely NO contact with children under the age of 10 years without adult supervision and approval by his probation officer." CP at 95.

Then, when Hunter was 22, he sexually abused 10-year-old ER by touching her vagina and buttocks after becoming aroused by seeing ER wearing tight shorts. Hunter became close with ER's family through church, where Hunter and ER's older siblings sang together in the church choir. Hunter pleaded guilty to abusing ER and was sentenced to 35 months imprisonment and 36 months supervision. He served this sentence consecutively to his suspended sentence for abusing KM.

After his release and while living in transitional housing, Hunter sexually abused SW, a 13-year-old girl, by touching her vagina and breasts. Hunter, who was 27 years old, was driving SW and other children home from a church party when he asked SW sexual questions, touched her pubic area over her clothes, tried to kiss her, reached under her bra, offered her $20, and asked her to come to his home. Hunter continued to phone SW at home after the abuse, asking her to

3

spend time alone with him. Hunter would also drive past SW's home and come to her school to offer SW a ride home. Hunter stipulated to the facts of his assault of SW, and was found guilty of sex abuse after a bench trial. Hunter was sentenced to 75 months confinement and 10 years of supervision.

B.      Most Recent Convictions

      1.      Modeling ruse

After his release from prison in Oregon, Hunter "fled parole" by moving to the state of Washington. CP at 868. Hunter failed to register as a sex offender, as required due to his prior sex crimes. In 2006 and 2007, Hunter repeatedly approached high-school aged girls in public places in an attempt to persuade the girls to meet him privately for an interview to become models. Hunter did not have any experience or connections to actually help the girls; the modeling conversations were part of a ruse.

During these conversations, Hunter steered the conversation towards the girls' bodies and sexual histories. For example, Hunter asked one 15-year-old girl if she was a virgin and told her that her figure would improve if she lost her virginity, and that she should have sex with someone "experienced." CP at 152. Hunter asked another victim to twirl and bend over and asked about her bra size. Another victim reported that Hunter asked her if she'd ever had sex before.

Hunter also asked for each of their phone numbers and when one victim gave him her real phone number, he called her at home. Hunter also offered some of the girls money and a ride home in his car. On two separate occasions, he offered 15-year-old girls $500 to interview with him. Hunter also told the girls that they would make thousands of dollars modeling for him. Hunter later admitted that the interviews were not legitimate and stated he developed the ruse to take money from the girls.

4

2. Convictions and sentence

The State charged Hunter by amended information with one count of failing to register as a sex offender and four counts of felony communication with a minor for immoral purposes for approaching MO, AS, SP, and DML with his modeling ruse, as described above. After a bench trial, the court found MO, AS, SP, and DML to be credible witnesses and found Hunter guilty of felony communication with a minor for immoral purposes against those four victims.[1] The court also found Hunter guilty of failing to register as a sex offender. The court sentenced Hunter to 120 months total confinement.

II. CIVIL COMMITMENT PROCEEDINGS

The State petitioned for Hunter's commitment in June 2021, shortly before Hunter's release from prison. Prior to trial, the State filed a motion asking the court to rule that Hunter's most recent convictions constituted recent overt acts as a matter of law.

A. State's Motion for Recent Overt Act Ruling

In its recent overt act motion, the State argued that it did not need to prove a recent overt act at trial because Hunter was incarcerated for conduct that would itself qualify as a recent overt act. The State argued that the court should apply the two-part factual and legal inquiry from *In re Detention of Marshall*, 156 Wn.2d 150, 125 P.3d 111 (2005). This inquiry asks courts to first examine the facts of the individual's history and mental condition, and next to answer the legal question of whether an objective person knowing those factual circumstances would have a reasonable apprehension of harm of a sexually violent nature resulting from the most recent

---

[1] The State also charged Hunter with two counts of attempted kidnapping and one count of second degree assault for his actions in the modeling ruse. Hunter was acquitted of these crimes after his bench trial. The attempted kidnapping and assault charges are not at issue in this appeal.

convictions. *Id.* at 157. The State also relied on Division One's decision in *In re Detention of Brown*, 154 Wn. App. 116, 225 P.3d 1028 (2010), where that court applied the *Marshall* inquiry by declining to require a factual hearing, declining to find facts by clear cogent and convincing evidence, and instead applied the legal test to already established facts. *Id.* at 125. The State asserted that under those cases, the court should consider "Hunter's history involving sexual offenses against minor children" as part of its factual inquiry. CP at 75.

The State's motion contained a long narrative on Hunter's history of sexual violence against children, including descriptions of allegations that were never proven and that Hunter disputed when he testified in a deposition. The State attached to its motion exhibits, such as police reports relating to the disputed and unproven allegations. The State also relied on some of the disputed allegations in its application of *Marshall*'s factual inquiry, in addition to relying on Hunter's prior sex crime convictions that are described above. The following table shows the incidents that the State presented to the court at the recent overt act stage:

| Year of Incident | Victim (or Alleged Victim) | Legal Status |
|---|---|---|
| 1985 | PO | Not charged. |
| 1986 | TT | Pleaded guilty. Sentenced to five-years probation. |
| 1987 | KM | Pleaded guilty. Sentenced to 24-60 months confinement, suspended, and later served after his next conviction. |
| 1990 | ER | Pleaded guilty. Sentenced to 35 months confinement. |
| 1995 | EA | Not charged. |
| 1995-96 | SW | Convicted based on stipulated facts. Sentenced to 75 months confinement. |
| 1996 | TJ | Charges dismissed by State. |
| 2004 | RL | Not charged. |
| 2006-07 | MO, AS, SP, DML | Convicted after bench trial. Sentenced to 120 months confinement. |
| 2007 | TS | Not charged. |

1.      Disputed child sex abuse allegations

The State's motion included the allegations of PO, EA, and TJ, all of whom reported to police that Hunter abused them as young children. PO was a six-year-old girl who told police that Hunter exposed his penis to her, hit her in the breast area, and "placed his lips on her vagina" over her clothes. CP at 79. Hunter was 16 at the time of the alleged assault and had access to PO because Hunter's mother was PO's babysitter. Hunter denied all of PO's allegations in his deposition.

EA was a 13-year-old girl who told police that Hunter repeatedly had intercourse with her in 1995 and that she agreed to this because she was afraid of him. Hunter admitted in his deposition that he kissed EA and "rubbed" her pubic area around that time. CP at 819. He maintained that when he met EA she said she was 19, and that he later learned by reading the police report that she was actually 13 at the time of this incident. Hunter also testified that he did not have intercourse with EA until several years later, in 2003.

TJ was an 11- or 12-year-old girl who told police that Hunter was driving her home from a church event when, in the back of his van, Hunter tried to kiss her and inserted his finger into her vagina, then started unzipping his pants but stopped when TJ started crying. In his deposition, Hunter disputed that version of events but admitted that after driving TJ home in the church van, he went inside her home and "massag[ed]" her shoulders, legs, and pubic area. CP at 834. Hunter testified that he believed TJ was 14 at the time.

2.      Disputed child rape allegations

The State also described the uncharged allegations of RL and TS, both of whom reported that Hunter drove them to remote locations and violently raped them. Hunter testified in his deposition that he did not rape these girls or anyone else. In its motion, the State relied on these allegations to argue, "Despite repeated periods of incarceration, Hunter has continued to prey on

7

teenage victims who are vulnerable and susceptible to control and deceit, as he did with T.S. in 2007 and R.L. in 2004." CP at 75.

RL told police that Hunter raped her in 2004, when she was 15, after grabbing her off the sidewalk, forcing her into his car, and locking her in the car as she tried to escape. RL reported that Hunter asked her if she wanted to be in a pornographic movie and showed her photos of nude, young-looking girls, including some photos where Hunter was on top of the girls. Hunter testified in his deposition that while Hunter was giving RL a ride, RL shared that she was "prostituting herself" and that he had intercourse with her in exchange for compensation. CP at 861. Hunter denied showing RL images of young nude girls, denied asking her to model, and denied RL's allegations that she cried and said, "[N]o" during this incident. CP at 863. Hunter maintained that RL told him she was 22 and that he only learned by reading the police report that she was 15.

Finally, TS told police that in 2007, Hunter raped her after he approached her on the street and told her he was a modeling agent. TS reported that after she agreed to a modeling interview, Hunter drove her to a remote location and convinced her to get into the back seat and to remove her clothes as part of the interview. TS told police that Hunter then raped her as she tried to push him away and scratch him. TS was 16 years old at the time. Hunter testified that he did not remember TS and that he never raped her or anyone else.

3.    Expert report

In applying *Marshall*'s factual inquiry regarding Hunter's mental condition, the State relied on the report of its expert, Dr. Goldberg, who diagnosed Hunter with pedophilia and with another paraphilic disorder involving sexual attraction to girls between 11 and 15 years old. The State attached Dr. Goldberg's report to its motion.

Dr. Goldberg based his diagnosis, in part, on an interview in which he questioned Hunter about both his convictions and about the uncharged allegations against him, described above. In his report, Dr. Goldberg described Hunter's comments about those allegations, including when Hunter denied the allegations altogether. Dr. Goldberg also noted that Hunter denied the facts underlying his most recent convictions. Specifically, the report indicated that Hunter told Dr. Goldberg that he had never met victims DML and SP. Hunter told Dr. Goldberg that he remembered meeting MO and AS at the library but denied attempting to have sex with them.

Dr. Goldberg's report explained that Hunter displayed a "striking" inability to take responsibility for his sexual offenses. CP at 209. Dr. Goldberg explained that Hunter made inconsistent statements in this regard—for example, Hunter believed that his "sentences were fair" but also "did not believe he did anything wrong." CP at 210. Similarly, Dr. Goldberg noted that Hunter "initially said he wanted to go to treatment" but then "could not explain what he would need treatment for." CP at 210. When Dr. Goldberg asked Hunter about "warning signs for reoffense," Hunter described being "alone with a girl that was young and in scantily clad clothing." *Id*. Hunter told Dr. Goldberg that he would avoid such a situation and that it was "not possible he would commit another sexual crime because he is now going to be a law-abiding citizen." *Id.*

Dr. Goldberg's report concluded that Hunter's paraphilic disorders caused Hunter "serious difficulty in controlling his sexually violent behavior" and that Hunter had poor "volitional and emotional capacity." CP at 213. Dr. Goldberg explained that Hunter had a diminished volitional capacity because "incarceration and treatment did not prevent Mr. Hunter from continuing to act upon his deviant sexual desires." *Id.* Dr. Goldberg also explained, with respect to emotional capacity, that Hunter did not "perceive his actions as traumatizing" and was "unconcerned" about the emotional effects of his abuse toward children. *Id.* In Dr. Goldberg's view, Hunter's failure to

9

take responsibility for prior assaults showed that Hunter failed to understand the consequences of his actions and showed a lack of emotional capacity.

### 4. Hunter's argument

Hunter did not submit any written argument in response to the State's motion. Hunter also did not submit his own expert's report, though he had been evaluated by his own expert a few months prior to the recent overt act hearing. At oral argument on the motion, Hunter did not indicate that he needed more time to prepare his response or to obtain a report from his expert.

At oral argument, Hunter agreed with the State that the two-step *Marshall* inquiry was applicable. Hunter did not argue against the *Brown* court's application of the *Marshall* inquiry. Hunter did not argue that the recent overt act issue should go before the jury or be subject to the clear and convincing evidence standard. Hunter did not mention due process and did not specifically argue that the court could not consider at this stage uncharged allegations or other allegations not resulting in convictions. Nor did he draw the court's attention to any portion of his deposition.

Hunter's argument primarily involved denying the uncharged allegations against him. Hunter argued,

> to the extent that the Court is considering as part of the history of offending behavior . . . the facts summarized by the State or included in police reports that are attached to the State's briefing . . . I would like to make a record of some disputes . . . for the Court to consider as well.

Verbatim Rep. of Proc. (VRP) (Nov. 4, 2022) at 47. Hunter went on to argue that the facts alleged by PO, TT, KM, EA, TJ, and RL were false. Hunter stated that with respect to PO's allegations, "there are no conviction materials because there was no conviction." *Id.* Hunter also stated that he disputed "some of [the] specific facts" underlying his most recent convictions for communication

with a minor for immoral purposes. *Id.* at 49. He explained, "to the extent that the Court is considering the facts for a review of the history that would be known to an objective person, Mr. Hunter would hope that the Court would consider his disputes and disagreements." *Id.* Finally, Hunter concluded, "Beyond that . . . I will defer to the Court." *Id.*

### 5.     Court's ruling

The trial court granted the State's motion and ruled that due process did not require the State to prove a recent overt act at trial because Hunter was incarcerated for conduct that would qualify as a recent overt act.

Before announcing its ruling, the court explained its application of the two-prong *Marshall* analysis, emphasizing under the factual prong that Hunter had a long history of sex offenses and did not seem deterred by prior periods of incarceration, and that Hunter was diagnosed with chronic paraphilic disorders. The court contextualized Hunter's modeling scheme within his offense history, stating that it showed Hunter's "continued pattern" of preying on young girls. VRP (Nov. 10, 2022) at 19. The court then applied *Marshall*'s legal inquiry and asked,

> Would an objective person with knowledge of these facts, the 20-year offending behavior, multiple periods of incarceration and a mental health disorder diagnosis, . . . have a reasonable apprehension of harm of a sexually violent nature from the acts in question?

*Id.* The court concluded that in light of Hunter's history and mental condition, his conduct underlying his most recent convictions amounted to recent overt acts as a matter of law. Hunter made no objection to the court's oral ruling.

The court later entered the following unchallenged findings of fact. It found that Hunter "sexually offended against minors for over 20 years" and that Hunter "used his positions of trust, as a caretaker and church volunteer, to gain access to minor children." CP at 1039 (Finding of Fact

11

(FF) 1, 2). It also found that Hunter was repeatedly accused of molesting and assaulting children and was convicted four times for first degree sex abuse in Oregon. It also found that Dr. Goldberg evaluated and diagnosed Hunter with pedophilia and another paraphilic disorder. Finally, it found that at the time the State petitioned for his commitment, Hunter was incarcerated for his 2007 convictions for communication with a minor for immoral purposes.

The court also entered the following findings that Hunter challenges in this appeal. It found, "Despite repeated incarcerations, [Hunter] continued to offend against minors." CP at 1040 (FF 5).[2] It also found that

> [i]n 2007, [Hunter] was convicted of four counts of Communicating with a Minor for Immoral Purposes for offenses occurring between 2006 through 2007 in Pierce County. None of the victims knew [Hunter]. [Hunter] approached teenage children at malls, on the streets, and a library across the street from a high school. He posed as a modeling agent and made sexual overtures to them. He attempted to lure many of the teenage children to his car. [Hunter] was successful at luring one known 16-year-old victim, T.S., to his car using his modeling ruse and raped her.

*Id.* (FF 6).

Based on its findings, the court concluded that "[a]n objective person knowing the factual circumstances of [Hunter]'s offending history and mental condition would have a reasonable apprehension that his sexual acts between 2006 and 2007 would cause harm of a sexually violent nature." CP at 1041 (Conclusion of Law (CL) 4). It went on to conclude that "[Hunter]'s acts underlying his convictions for Communicating with a Minor for Immoral Purposes constitute a recent overt act under *Marshall v. State* and RCW 71.09.020(13)." *Id.* (CL 5). Finally, the court

---

[2] In an apparent scrivener's error, the trial court entered two findings of fact numbered 5. *See* CP at 1040. The finding quoted here is the one Hunter challenges in this appeal. *See* Br. of Appellant at 2.

ruled that "[p]ursuant to *Marshall v. State*, due process does not require the State to prove a recent overt act at trial." *Id.*

B.      Jury Trial

The case proceeded to a 16-day jury trial at which the State was not required to prove that Hunter committed a recent overt act. The State offered Hunter's deposition testimony, as described above, as well as testimony from several of Hunter's alleged victims. Specifically, the State offered the testimony of three victims who reported facts to police for which Hunter was eventually convicted: TT, ER, and AS. It also offered the testimony of four victims who made allegations against Hunter for which he was never convicted: TJ, TS, PO, and RAE.[3]

The State also offered Dr. Goldberg's expert testimony, consistent with his report described above. Hunter offered the testimony of his own expert who disagreed with Dr. Goldberg's diagnoses and opinions.

C.      Verdict and Commitment

The jury found that the State proved beyond a reasonable doubt that Hunter was a sexually violent predator. Hunter was then committed by court order.

Hunter appeals his commitment. Specifically, he assigns error to the trial court's conclusion that his convictions pertaining to the modeling ruse constituted recent overt acts as a matter of law. Hunter also assigns error to the trial court's findings in support of its recent overt act ruling that he continued to reoffend against minors despite repeated incarcerations and that he successfully lured TS to his car and raped her as part of the ruse.

---

[3] RAE alleged that Hunter approached her with the modeling ruse at the library and grabbed her arm after she told him she was not interested. Hunter was charged and acquitted of the attempted kidnapping and second degree assault of RAE. RAE's allegations were not considered at the recent overt act stage.

ANALYSIS

I. SEXUALLY VIOLENT PREDATOR STATUTE

The SVP statute permits the State, in limited circumstances, to civilly commit sexually violent predators. *In re Det. of Post*, 170 Wn.2d 302, 309, 241 P.3d 1234 (2010). A "sexually violent predator" is an individual who "has been convicted of or charged with a crime of sexual violence," "suffers from a mental abnormality or personality disorder," and because of that abnormality or disorder, is "likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(19); *Post*, 170 Wn.2d at 310. The State may petition for commitment of those who have been convicted of a sexually violent offense either before or after the individual is released from confinement. RCW 71.09.030(1)(a), (e).[4] Before the court will order a commitment under the SVP statute, the State must prove beyond a reasonable doubt that the individual is a sexually violent predator. RCW 71.09.060(1).

Due process permits an indefinite commitment under the SVP statute only if the individual is found to be mentally ill and presently dangerous. *In re Det. of Albrecht*, 147 Wn.2d 1, 7-8, 51 P.3d 73 (2002). When the State petitions to commit a sex offender who has already been released into the community, present dangerousness requires proving beyond a reasonable doubt that the offender has committed a recent overt act. RCW 71.09.060(1); *Albrecht*, 147 Wn.2d at 8-11. A "recent overt act" is an act or threat "that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in the act or behaviors." RCW 71.09.020(13).

---

[4] RCW 71.09.030 was amended in 2023. *See* LAWS OF 2023, ch. 453, § 27. Because the amendments do not affect our analysis, we use the current version.

However, present dangerousness is proved differently when the State files a petition to commit a currently incarcerated sex offender. *Marshall*, 156 Wn.2d at 157. If the defendant is incarcerated when the State files its petition, the State does not need to prove a recent overt act, but instead, "the question is whether the confinement is for a sexually violent act or an act that itself qualifies as a recent overt act." *Id.* at 158. This inquiry "is a mixed question of law and fact for the trial court, not the jury." *In re Det. of Pasley*, 28 Wn. App. 2d 823, 834, 538 P.3d 948 (2023), *review denied*, 3 Wn.3d 1009, 551 P.3d 444 (2024). The court applies a two-part analysis: first, it examines "the factual circumstances of the individual's history and mental condition," and next, it decides the legal question of "whether an objective person knowing the factual circumstances . . . would have a reasonable apprehension that the individual's act would cause harm of a sexually violent nature." *Marshall*, 156 Wn.2d at 158.

## II. RAP 2.5

Hunter argues that the trial court erred when it concluded that his most recent convictions constituted a recent overt act because the court misapplied the factual prong of *Marshall*'s analysis when it failed to apply the clear and convincing evidence standard, considered unproven and disputed allegations as part of his history, and relied on Dr. Goldberg's report for his mental condition. The State argues that Hunter failed to preserve his arguments and has not shown manifest error affecting a constitutional right. We agree with the State.

A.      RAP 2.5 Standard

Generally, we may decline to consider arguments that were not made to the trial court. RAP 2.5(a). However, a party may raise for the first time on appeal a manifest error affecting a constitutional right. RAP 2.5(a)(3); *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009).

To demonstrate manifest error affecting a constitutional right, an appellant must show both that the claimed error is "truly of constitutional dimension" and that the claimed error is "manifest." *O'Hara*, 167 Wn.2d at 98. An error is "manifest" if it caused the appellant actual prejudice. *Id.* at 99. Actual prejudice requires a plausible showing that the error had "'practical and identifiable consequences'" in the appellant's trial. *Id.* (internal quotation marks omitted) (quoting *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)).

When determining whether a supposed error has practical and identifiable consequences, we stand "in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error." *Id.* at 100. It is not our role to "address claims where the trial court could not have foreseen the potential error" or where "trial counsel could have been justified in their actions or failure to object." *Id.* Accordingly, we focus our actual prejudice analysis on "whether the error is so obvious on the record that the error warrants appellate review." *Id.* at 99-100. As part of this inquiry, we preview the merits of the claimed constitutional error to determine whether the argument is likely to succeed. *State v. Kirwin*, 165 Wn.2d 818, 823, 203 P.3d 1044 (2009).

B.    Failure to Preserve Errors

We conclude that Hunter failed to alert the trial court to any of the issues he raises on appeal, and thus, his challenges to the trial court's recent overt act determination are unpreserved under RAP 2.5.

Hunter did not argue before the trial court that the trial court could not consider the disputed allegations against him in the court's recent overt act inquiry. Although Hunter asserts in his appellate brief that he "noted" that the disputed allegations of PO, EA, TJ, and RL lacked "'conviction materials,'" the record reflects that Hunter made that comment only with respect to

16

PO. Br. of Appellant at 10; *see* VRP (Nov. 4, 2022) at 47. And perhaps more importantly, Hunter did not explain to the court why it would *matter*, in his view, that there were no conviction materials to support a particular allegation. Instead, Hunter argued against the State's motion predominantly by denying the facts presented by the State. Contesting facts is not the same as arguing that the court should not consider contested facts in the first instance. Although Hunter argued that the allegations against him were not true, this is not sufficient to alert the court to the argument he now raises—that the disputed allegations were *outside the scope* of a pretrial recent overt act determination altogether. Thus, Hunter failed to preserve this claim of error.

Hunter also did not argue against the trial court's reliance on Dr. Goldberg's report in considering his mental condition. Though Hunter had already been evaluated by his own expert, Hunter did not present his own competing expert report. Indeed, Hunter did not dispute Dr. Goldberg's diagnoses or even mention the issue of his mental condition at the recent overt act hearing. The trial court, therefore, was not alerted to Hunter's argument against the use of Dr. Goldberg's report and he failed to preserve this claim of error for this as well.

Nor did Hunter alert the trial court to his argument that the State had an incorrect view of the law. Hunter expressly agreed that the *Marshall* analysis applied and did not disagree with *Brown*'s application of *Marshall*, though the State cited both cases heavily in its motion. He did not argue that *Brown* was incorrectly decided or inapplicable to the facts of his case, as he now does. He did not mention due process or the clear and convincing evidence standard. Moreover, to the extent Hunter now argues that the trial court was not permitted to weigh evidence, he may even have invited that error by asking the trial court to consider his *denial* of the facts presented by the State. Thus, Hunter's arguments regarding the evidentiary burden and due process are likewise unpreserved.

17

C.      Evidentiary Burden

Having concluded that Hunter's arguments are unpreserved, we ask whether Hunter can show "manifest error affecting a constitutional right." RAP 2.5(a)(3). Hunter argues that due process required the State to prove by clear and convincing evidence that his most recent convictions were for recent overt acts. But Division One has already rejected this argument in *Brown*, and thus, Hunter cannot establish manifest error. Although Hunter invites us to depart from *Brown*, we decline.

Federal due process requires proof of dangerousness by at least clear and convincing evidence. *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992). Hunter argues that this minimum evidentiary standard applies to the pretrial recent overt act inquiry because proving a recent overt act is essential to proving dangerousness.

As Hunter acknowledges, Division One of this court considered and rejected this argument in *Brown*. In *Brown*, the State petitioned to commit Brown as a sexually violent predator while Brown was incarcerated for possession of depictions of child sexual abuse. 154 Wn. App. at 120. The trial court determined that Brown's possession crime constituted a recent overt act. *Id.* Brown argued that the trial court should have conducted an evidentiary hearing applying the clear and convincing evidence standard to its recent overt act inquiry. *Id.* at 122. Division One disagreed. *Id.* at 125-28. The court reasoned that, although due process requires clear and convincing evidence to prove "the ultimate issue of dangerousness at trial," that issue is distinct from "the trial court's preliminary overt act determination." *Id.* at 125-26. When the trial court engages in *Marshall*'s factual prong, a trial court does not act as a factfinder, but instead makes its determination "as a matter of law based upon the factual record documenting the prior act and the mental condition of the respondent." *Id.* at 126. In other words, because a trial court does not resolve disputed facts in

a pretrial recent overt act determination, such a determination is not subject to "the standard of proof courts apply to unresolved factual issues necessary to civilly commit a person involuntarily." *Id.* Division One therefore affirmed Brown's commitment.

In light of *Brown,* where Division One rejected the very argument that Hunter is making here, we conclude that Hunter's alleged error regarding application of the clear and convincing burden of proof is not manifest.

Hunter urges us to reject the *Brown* court's reasoning but we see no reason to depart from *Brown*. In Hunter's view, "the 'dangerousness' inquiry cannot be separated from the [recent overt act] inquiry—the former incorporates the latter, as a matter of due process." Reply Br. of Appellant at 3 (emphasis omitted). But as the supreme court has repeatedly explained, due process does not require the State to prove a recent overt act at trial when, on the day the petition is filed, the respondent is incarcerated for a crime that amounts to a sexually violent offense or a recent overt act. *In re Young*, 122 Wn.2d 1, 41, 857 P.2d 989 (1993); *In re Det. of Henrickson*, 140 Wn.2d 686, 697, 2 P.3d 473 (2000); *Albrecht*, 147 Wn.2d at 8-11; *Marshall*, 156 Wn.2d at 157-58. By contrast, due process *does* require the State to prove a recent overt act where the respondent is incarcerated for an act that *does not* meet the definition of a sexually violent offense or recent overt act. *Albrecht*, 147 Wn.2d at 10-11. Because due process requirements differ for these two groups of currently incarcerated respondents, the trial court must decide, before a case proceeds to trial, whether the State must prove at trial that the respondent committed a recent overt act. *Marshall*, 156 Wn.2d at 158. That requires answering the threshold question of "whether the confinement is for a sexually violent act or an act that itself qualifies as a recent overt act." *Id.*

Whereas here, the offender is confined for a crime that did not cause sexually violent harm; the trial court asks whether the conduct underlying the respondent's conviction constitutes a recent

overt act as a matter of law. *Id.* In this scenario, the facts underlying the individual's incarceration are, as the *Brown* court explained, "already established." *Brown*, 154 Wn. App. at 125. A currently incarcerated offender has already had an opportunity to contest the facts underlying their incarceration, including having them decided by a jury beyond a reasonable doubt. *Id.*; U.S. CONST. amend. XIV. The trial court's recent overt act inquiry "is not meant to provide a second opportunity to litigate those facts." *In re Det. of Leck*, 180 Wn. App. 492, 510, 334 P.3d 1109 (2014); *Brown*, 154 Wn. App. at 125. In other words, because the pretrial recent overt act inquiry concerns the legal effect of conduct *for which the offender is currently incarcerated*, the offender is not entitled to an additional evidentiary determination by clear and convincing evidence that *the same conduct* constitutes a recent overt act.

It is true that the trial court engages in a factual inquiry before deciding whether the respondent is incarcerated for a recent overt act. Under *Marshall*, the trial court must conduct a two-step analysis that first considers "the factual circumstances of the individual's history and mental condition." *Marshall*, 156 Wn.2d at 158. However, as Hunter agrees, the trial court's role "is not that of a fact finder," even when examining the offender's history and mental condition in *Marshall*'s factual prong. *Brown*, 154 Wn. App. at 125; *see* Br. of Appellant at 39, 49. The limited factual inquiry involved in *Marshall*'s factual prong is used only so that the court can resolve the legal prong from the point of view of an objective person who knows the respondent's history and mental condition. *Marshall*, 156 Wn.2d at 158. We agree with *Brown* that this does not transform the pretrial recent overt act inquiry into a question of fact that is subject to the same quantum of evidence required to resolve the ultimate issue of dangerousness at trial. *Brown*, 154 Wn. App. at 125-26.

20

We therefore decline Hunter's invitation to depart from *Brown*. And in light of *Brown*, Hunter's alleged error is not manifest and he is not entitled to raise this argument for the first time on appeal.

D.    Consideration of Disputed Facts

Hunter's remaining argument is that the trial court improperly relied on disputed facts regarding his history and mental condition before it ruled that Hunter's most recent convictions were for conduct amounting to a recent overt act. Hunter argues that the court should not have considered any disputed allegations against him when assessing his history under *Marshall*'s factual prong. He also argues, in passing, that the court should not have considered the State's expert report when assessing his mental condition. However, Hunter was not prejudiced by the court's consideration of disputed facts because even if the court had reviewed only the uncontested or previously adjudicated facts, the convictions on which Hunter was being held were recent overt acts. Therefore, any alleged error was not manifest.

1.    History

Hunter challenges the trial court's finding that he continued to reoffend against minors despite repeated incarcerations, but there is substantial evidence in the record to support that finding. At the age of 17, Hunter abused seven- or eight-year-old TT and received five-years probation. Hunter was ordered not to have contact with children under the age of 16. Nonetheless, the month after receiving his sentence and while on probation, Hunter went on to sexually assault KM. Hunter received a suspended sentence for that crime and again, the court ordered him to have no contact with young children without supervision and approval. Before the end of his second probationary period, Hunter reoffended again when he sexually abused ER, who was 10. For his assault of ER, he was imprisoned for 35 months after a guilty plea.

Shortly after he was released from prison for assaulting ER and KM, Hunter again reoffended while on parole. Hunter was charged with the sex abuse of SW, for preying on her as the driver of a church van. After a bench trial on stipulated facts, Hunter was found guilty and sentenced to 75 months confinement and 10 years supervision for assaulting SW.

After his release, Hunter moved from Oregon to Washington to "fle[e] parole" and failed to register as a sex offender. Then, he began approaching teenaged girls in public places, asking them sexual questions, offering them rides in his car, and asking them to agree to private interviews so Hunter could help them pursue modeling careers. Hunter has never claimed that the interviews were legitimate, and he admitted to developing the ruse to take money from the girls. But based on the court's findings, Hunter's conduct toward MO, SP, DML, and AS was sexually motivated. Hunter was found guilty of four counts of communicating with a minor for immoral purposes. Therefore, even without considering any of the unproven, disputed allegations, Hunter's conviction records contain ample evidence to support the trial court's finding that Hunter continued to reoffend despite a series of convictions.

The question before the trial court at the recent overt act hearing was whether Hunter's conduct would invoke a reasonable apprehension of sexually violent harm in the mind of an objective person who knew of Hunter's history and mental condition at the time he approached MO, SP, DML, and AS with his modeling ruse. Notably, the trial court did not rely on any particular allegation in its history inquiry, reasoning instead that Hunter's most recent convictions were continuations of Hunter's pattern of preying on children. Hunter's long history of sex crimes, even if confined to only the facts underlying his previous convictions, would prompt a reasonable apprehension in the mind of an objective person. Hunter is a persistent reoffender, undeterred by the consequences he faced for assaulting TT, KW, ER, and SW. At the time Hunter was targeting

22

young girls with his sexually motivated modeling ruse, he was again flouting a consequence of his prior sexual violence, having moved to Washington to escape his parole restrictions and failing to register as a sex offender.

An objective person aware of Hunter's persistent history of reoffending, including seeking out children while on parole for child sex abuse, fleeing Oregon, and failing to register as a sex offender in Washington, would have a reasonable fear that Hunter would inflict sexually violent harm on the girls he approached with his modeling ruse. This fear would only be amplified by the facts found by the trial court that convicted Hunter of communicating with a minor for immoral purposes for his conduct toward MO, SP, DML, and AS. Hunter repeatedly approached high-school aged girls and attempted to persuade them to meet him privately for an interview to become models. Then, Hunter steered the conversations toward the girls' bodies and sexual histories. Hunter asked for their phone numbers, offered them money, and rides in his car. In examining these facts, Hunter's conviction history is more than sufficient to produce an objectively reasonable apprehension of violent harm, especially taking into account Hunter's mental condition as described below.[5]

2. Mental condition

Hunter was diagnosed with pedophilia and another paraphilic disorder, and he did not dispute these diagnoses at the recent overt act hearing. Although Hunter asserts that the trial court should not have relied on Dr. Goldberg's report, Hunter presents no argument or authority to explain this position. In the limited briefing on this issue, Hunter characterizes his mental condition

---

[5] Hunter also challenges the trial court's factual finding that he successfully lured TS to his car and raped her as part of the modeling ruse. Because that finding is not necessary to support the challenged conclusion that Hunter's proper convictions were recent overt acts, we need not address this issue.

as "disputed" and complains that the trial court examined his mental condition "before that issue went before the jury." Br. of Appellant at 40. But the record shows that the content in Dr. Goldberg's report was *not* disputed at the time of the recent overt act ruling, because Hunter failed to present a competing evaluation or even to argue against Dr. Goldberg's conclusions. Therefore, the trial court properly considered the then undisputed report of Dr. Goldberg prior to trial.

Hunter's diminished self-control, lack of empathy, and lack of self-insight, as described in Dr. Goldberg's then uncontested report, would strongly influence an objective observer's view of Hunter's modeling ruse when taken in the context of Hunter's prior convictions. Based on Dr. Goldberg's report, it is apparent that Hunter displayed "serious difficulty in controlling behavior," a hallmark of dangerousness. *Kansas v. Crane*, 534 U.S. 407, 413, 122 S. Ct. 867, 151 L. Ed. 2d 856 (2002). Taken together with Hunter's extensive conviction history, Hunter's undisputed mental condition supports the court's conclusion that Hunter's most recent convictions were for recent overt acts.

Even in the face of Hunter's alleged error—consideration of facts that had not yet been adjudicated or admitted—Hunter's conduct toward MO, SP, DML, and AS would evoke an objectively reasonable apprehension of sexually violent harm in the mind of an objective person, knowing only the undisputed facts of Hunter's history and mental condition. Ultimately, the court's recent overt act ruling would have been the same absent the alleged error. Hunter therefore has not identified a manifest constitutional error warranting our review for the first time in this appeal.

## CONCLUSION

We affirm.

No. 57771-2-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

We concur:

CRUSER, C.J.

CHE, J.